DEVELOPMENT CORPORATION OF AMERICA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Development Corp. of America v. Commissioner
Docket No. 8538-80.
United States Tax Court
T.C. Memo 1988-127; 1988 Tax Ct. Memo LEXIS 155; 55 T.C.M. (CCH) 455; T.C.M. (RIA) 88127; March 24, 1988. Alyce C. Halchak and Morris R. Sherman, for the petitioner. Richard J. Sapinski, Robert A. Stern, and William S. Garofalo, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioner's Federal income *158 tax for the calendar years 1973 and 1975 in the amounts of $ 286,163 and $ 481,466, respectively. As a result of the judicial determination of a suit between petitioner and Henry D. Mayer, [1] petitioner is no longer contesting the deficiency determined for 1973. After concessions by petitioner, the issues for decision are: (1) Whether petitioner's acquisition in 1969 of all of the stock of Mayer Construction Company, Inc., was solely in exchange for its voting common stock so as to constitute a tax-free reorganization under section 368(a)(1)(B)[2] and thereby give petitioner a carryover basis in the Mayer stock. Petitioner now contends that the 1969 acquisition was not a tax-free "B" reorganization and that it is entitled to a higher cost basis in the Mayer stock. This issue turns on whether or not petitioner gave something in addition to its stock, i.e., "boot," to acquire the Mayer stock. *159 (2) Whether petitioner is entitled to either a bad debt deduction or a worthless securities deduction in 1975 in connection with its wholly owned subsidiary, Mayer Construction Company, Inc., or with its Mayer stock. This depends on factual and legal issues in addition to the basis question above: (a) Whether petitioner can avoid the nonrecognition provisions of section 332 in connection with the liquidation of its Mayer Construction subsidiary in 1975; (b) Whether petitioner's advances to Mayer Construction Company, Inc., were loans or contributions to capital; and (c) If petitioner's advances were loans, whether the liquidation of Mayer Construction Company, Inc., followed by the transfer of all of its assets to another of petitioner's wholly owned subsidiaries constituted in substance a reorganization under section 368(a)(1)(D) so that any loss or bad debt is recognized, if at all, in 1979, a year not before the Court. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. At the time of the filing of the petition in this case, petitioner, Development *160 Corporation of America (hereinafter "DCA") was a Florida Corporation having its principal offices in Hollywood, Florida. DCA timely filed Form 1120 returns (on a consolidated basis with its subsidiaries) for the years 1973 and 1975. [3] At all times relevant to this proceeding, DCA was a publicly held company whose shares were traded on the over-the-counter market prior to November 3, 1970 and on the American Stock Exchange thereafter. DCA, acting through some 30 to 60 operating subsidiaries, is engaged primarily in the business of real estate, home building, land development, and commercial development. Prior to 1969 DCA's business was primarily confined to the State of Florida. Prior to the transaction at issue, DCA's founders, principal officers, and largest stockholders were Alvin Sherman, Irving Fishman, and Edward Lempka. They owned 26.1 percent, 7.3 percent and 9.2 percent, respectively, of DCA's 736,943 shares of issued and outstanding stock. At that time DCA had only one class of stock issued and outstanding, i.e., voting common stock having a par *161 value of $ .10 per share. DCA's tax counsel since 1957 has been Morris Sherman (unrelated to Alvin Sherman), a New York attorney primarily engaged in the practice of tax and corporate law. From 1958 through 1969, Henry Mayer was engaged in the business of constructing and selling homes, primarily in Ocean and Camden Counties, New Jersey. During the year 1969, Mr. Mayer, his wife, Marianne, and their minor children were the controlling stockholders of Mayer Construction Company, Inc. (hereinafter "Mayer Construction"), Barnegat Light Development Corporation, Inc. (hereinafter "Barnegat"), and Coast Realty Company, Inc. (hereinafter "Coast"). Mayer Construction, Barnegat and Coast were New Jersey corporations through which Mr. Mayer's home construction and sales activities were conducted. THE ACQUISITION AGREEMENT
In approximately April of 1969, Mr. Mayer placed an ad in the Wall Street Journal offering his three businesses for sale. DCA, through its vice president for acquisitions, George Samuels, responded to the ad and entered into negotiations with Mr. Mayer. Mr. Mayer then met in Florida and in New Jersey with Alvin Sherman, president of DCA, to negotiate the terms *162 of DCA's acquisition of the Mayer companies. DCA had a cash shortage at the time and did not have the cash to buy the Mayer companies. Also Mr. Mayer did not want to incur the tax liability on the gain that would result from a sale of his companies, particularly if he received only stock and no cash in the transaction. DCA and Mr. Mayer agreed that the acquisition was to be accomplished through a tax-free reorganization consisting of an exchange solely of DCA voting common stock for all outstanding shares of the Mayer companies. DCA also believed at that time that an exchange solely for stock, requiring no cash, would allow DCA a pooling of interest with the Mayer companies for financial accounting purposes for the entire year of the acquisition, 1969. DCA understood that a taxable transaction would have created a large tax liability for Mr. Mayer which he could not pay if the transaction included no cash. Therefore, both DCA and Mr. Mayer sought a tax-free reorganization under Internal Revenue Code section 368(a)(1)(B). By letter dated June 25, 1969 to Alvin Sherman, Mr. Mayer set forth his understanding of the various items they had been discussing *163 in their negotiations up to that point. Those items included the following proposals. [4] Prior to the acquisition by DCA, the three Mayer companies were to merge, with Mayer Construction to be the surviving corporation. The stockholders of Mayer Construction were to receive DCA stock consisting of an initial "payment" equivalent to eight times the earnings of the consolidated Mayer companies for the fiscal year ending September 30, 1969, plus additional "compensation" based on six times the average excess earnings of the consolidated Mayer companies over the next three years. The payment of the additional "compensation" was to be made at the end of the three-year period. As a wholly owned subsidiary of DCA, Mayer Construction would pay DCA a management fee equal to three-quarters of one percent of the first $ 2,000,000 of sales and one percent of the sales thereafter. Mr. Mayer was to be placed on the board of directors of DCA. All stock issued by DCA was to be of a restricted nature. All of the major DCA stockholders were to be entitled to participate in any secondary stock offering which was to be registered in the same proportion as the holdings of all other restricted stockholders. *164 All restrictions were to cease at the end of the three-year period. The holders of restricted stock were to vote with management during that period. DCA was to arrange loans to Mayer Construction, as required by Mayer Construction, to be used to acquire additional land and to provide additional working capital to finance the expansion of operations and the increased inventories such expansion would require. The interest rate on loans by DCA was to be the same rate that DCA paid for its money. DCA was to indemnify Henry Mayer and Marianne Mayer against losses on present and future corporate obligations personally guaranteed by them. The initial loan requirements were anticipated to be approximately $ 400,000, with as much as $ 1 million required over the next two years. Some of these proposals were later incorporated in the lawyers' drafts and in the final agreement; others were not. Morris Sherman, DCA's tax counsel, *165 was requested by DCA to represent it in drafting the agreement for the acquisition of the Mayer companies. He prepared the first draft of such an agreement. A copy of Mr. Mayer's letter of June 25, 1969 had been sent to Morris Sherman on July 2, 1969, along with George Samuels' comments thereon. Mr. Mayer's annotated letter, along with oral instructions from Alvin Sherman, formed the basis for Morris Sherman's first draft. In proparing the initial and all subsequent drafts of the agreement, Morris Sherman was aware that the parties to the agreement wanted the transaction to be a tax-free reorganization under section 368(a)(1)(B). Morris Sherman was an experienced tax lawyer who knew the legal requirements for such a tax-free reorganization. With regard to Mr. Mayer's stated desire to be placed on the board of directors, Morris Sherman told Alvin Sherman that any such undertaking by DCA to place Mr. Mayer on the DCA board would constitute "boot," something other than solely voting stock received in the exchange, and jeopardize the tax-free nature of the exchange. Neither Morris Sherman's various drafts nor the final agreement contained any reference to Mr. Mayer's acquiring *166 a seat on the board of directors of DCA. On July 24, 1969, Morris Sherman completed his initial draft of the proposed acquisition agreement and it was delivered to Mr. Mayer on the same day for review. Mr. Mayer, at the recommendation of his accountant, retained the services of David Beck, a New Jersey attorney primarily engaged in the practice of tax law, to represent him and the other shareholders of the Mayer companies in the acquisition by DCA. Upon receipt of Mr. Sherman's initial draft, Mr. Mayer, who is not a lawyer, reviewed it and prepared a list of his comments. He then forwarded both the draft and his comments to David Beck on July 25, 1969. Mr. Beck was an experienced tax lawyer who knew the legal requirements for a tax-free reorganization under section 368(a)(1)(B) ("a tax-free 'B' reorganization"). Mr. Beck and Mr. Mayer discussed the terms of the proposed acquisition in detail. Mr. Mayer again voiced his desire to be on DCA's board of directors, but was advised by Mr. Beck that this was a matter to be discussed with his fellow DCA shareholders and was not a subject for the proposed agreement between DCA and the Mayer companies. Mr. Beck discussed at length *167 with Mr. Mayer the requirements for a tax-free "B" reorganization and explained to him the concept of "boot." Morris Sherman's first draft of the acquisition agreement stated that it was intent of the parties that the stock-for-stock exchange constitute a tax-free reorganization within the meaning of Internal Revenue Code section 368(a)(1)(B). The document provided for an exchange of shares in two installments, referred to as the "Initial Shares," and the "Additional Shares." The number of initial shares was to be calculated based on the consolidated earnings of the Mayer companies for the fiscal year ending September 30, 1969. The number of additional shares was to be calculated based on the excess of the average earnings of Mayer Construction (the new DCA subsidiary) for the period October 1, 1969 through December 31, 1972 over the Mayer companies' earnings for the fiscal year ended September 30, 1969. The additional shares were to be issued to the shareholders subsequent to December 31, 1972. The maximum number of additional shares was limited to (i.e., not to exceed) the number of initial shares. In reviewing Morris Sherman's initial draft of the *168 agreement, Mr. Beck became concerned about the possibility of the Mayer shareholders having imputed interest income under Internal Revenue Code section 483 by reason of the additional shares being structured as a "contingent earn-out." A then recent article entitled "Contingent Stock Pay-Outs in Tax-Free Reorganizations" by David R. Tillinghast, Esq., had appeared in the Spring 1969 edition of The Tax Lawyer. It contained an extensive discussion of the problem of imputed interest with regard to contingent stock earn-outs in tax-free reorganizations. [5] The article suggested a method to avoid the application of section 483 by effecting a current or present delivery of the earn-out shares into escrow subject to defeasance or divestiture at the end of the earn-out period. The article placed emphasis on Example 8 of section 1.483-1(b)(6), Income Tax Regs. (hereinafter "Example 8"). [6] Mr. Beck discussed his concerns with Morris Sherman and showed him the Tillinghast article. Mr. Sherman agreed that his initial draft as written, with the additional shares to be issued after December 31, 1972, would trigger imputed interest under section *169 483. [7]
*170 Morris Sherman then discussed Mr. Beck's concerns with Alvin Sherman and explained to him that conforming the exchange to Example 8 would require that DCA fix the number of DCA shares to be "paid" to the Mayer shareholders for the shares of the Mayer companies. He further explained that under Example 8 the additional shares then would have to be issued and placed in escrow. During the earlier negotiations, Alvin Sherman had estimated the number of initial shares to be approximately 40,000 to 45,000, based on the earnings of the consolidated Mayer companies, for their preceding fiscal year or up to about mid-1969. Due to the Mayer companies' greatly increasing earnings in their last quarter, however, the total number of initial shares was now expected to be between 80,000 and 85,000 shares. That would make Mr. Mayer the second largest stockholder of DCA even without the additional shares. This development came as a shock to Alvin Sherman, and for this business reason he did not want to issue so many shares of DCA stock to acquire the Mayer companies. Thus, Alvin Sherman was opposed to the revision sought by Mr. Beck because he was unwilling to have DCA issue the resulting 160,000 *171 to 170,000 shares to the Mayer stockholders. In a telephone conversation between Mr. Mayer and Alvin Sherman, however, Mr. Mayer told him that without the proposed revision there would be no deal. Mr. Mayer insisted that the transaction be a wholly tax-free exchange of stock for stock, and that he was not willing to go through with the deal if there was a risk of a large tax liability for imputed interest income. [8] Alvin Sherman finally acquiesced. After discussing the matter with Fishman and Lempka, Alvin Sherman approved the revision and Morris Sherman undertook to draft the language. After discussions with Mr. Beck, study of the Tillinghast article, and his own independent legal research, Morris Sherman drafted the language of the proposed revision. In preparing the revised language, Morris Sherman was aware that the purpose of the revision was to structure the transaction so as to avoid the application of section 483 to the additional shares and to eliminate the risk of imputed interest income to Mr. Mayer and the other Mayer shareholders. *172 The proposed revision called for a specified number of DCA shares to be divided into two installments referred to as the "Initial Shares" and the "Additional Shares." The initial shares were to be delivered to the Mayer shareholders on the closing date and the additional shares were to be delivered to the shareholders on a post-closing date. However, the Mayer shareholders had the right to request that DCA deliver to them the maximum number of additional shares prior to the post-closing date, provided that the shareholders then delivered those shares to Mr. Beck and Morris Sherman as escrow agents, to be held until the end of the escrow period. Because the parties were eager to conclude the transaction as quickly as possible, the attorneys did not seek a ruling from the Internal Revenue Service as to whether the language of the proposed provision avoided the unstated interest problem under section 483. Morris Sherman's second draft, dated August 1, 1969, included the above proposed revision and was delivered to Mr. Beck approximately a week after the first draft had been received. Mr. Beck carefully reviewed the entire second draft and made the following changes. The second *173 draft stated, "WHEREAS, the shareholders desire to sell and transfer to D.C.A. and D.C.A. desires to acquire from the Shareholders all of the outstanding shares of the Corporations." (Emphasis supplied.) Mr. Beck deleted the words "sell and" because he wanted to avoid any possible taint of sale or any possible indication that the transaction was anything other than an exchange of stock solely for stock. Where the revision called for the exchange of shares in two "installments," Mr. Beck changed the word "installments" to "categories." The second draft, unlike the first, contained a provision indemnifying Mr. Mayer and his wife against losses on Mayer corporate obligations personally guaranteed by them. Mr. Beck eliminated that indemnity provision, because he believed it constituted "boot" representing more than an exchange of stock solely for DCA voting stock. Mr. Mayer's proposed employment agreement with Mayer Construction (the proposed new DCA subsidiary) was also discussed. Mr. Beck was concerned that there should be no boot either by virtue of anything in the terms of the final agreement or by virtue of something that occurred outside the agreement, an example of which *174 would be the receipt of excessive compensation pursuant to an employment agreement. Mr. Mayer was to receive a larger salary under the employment agreement with the DCA subsidiary than he had received previously from the Mayer companies. It was concluded by the parties, however, that Mr. Mayer's increased responsibilities and duties justified the increase in compensation and, therefore, the employment contract would not constitute "boot." The final Agreement and Plan of Reorganization (hereinafter "the acquisition agreement") was executed on September 5, 1969. The acquisition agreement specifically stated that it was the intent of the parties [9] that DCA acquire all outstanding shares of the Mayer companies solely in exchange for shares of DCA voting common stock and for "no cash or other property." The agreement expressly stated that the exchange was intended by the parties to be a tax-free reorganization within the meaning of section 368(a)(1)(B) of the Internal Revenue Code, and that the parties would not knowingly or deliberately take, maintain or defend any course of action or position conflicting with or being inconsistent with their interest that *175 the exchange be a tax-free reorganization. The Mayer companies were to be consolidated or merged into Mayer Construction and on the closing date all outstanding shares of Mayer Construction were to be delivered to DCA. The DCA stock to be received by the former Mayer stockholders was to be delivered and maintained in two separate categories referred to as the initial shares and the additional shares. Concurrent with the delivery of the Mayer Construction shares to DCA on the closing date, DCA was to deliver to the former Mayer shareholders 85,000 shares of its common stock as the initial shares. Immediately thereafter, the Mayer shareholders were to deliver to the escrow agents, Morris Sherman and David Beck, 25,000 of the initial shares to be held in escrow for one year. The escrow shares were subject to earlier release upon computation and verification of the number of adjusted initial shares. The number of adjusted initial shares was to be based on the consolidated net earnings of Mayer Construction for the year ending September 30, 1969. Mayer Construction was to provide a consolidated financial statement for that period no later than December 15, 1969. The excess, if any, *176 of the 85,000 initial shares delivered to the shareholders on the closing date over the number of the adjusted initial shares computed under the agreement was to be redelivered to DCA. However, the former Mayer shareholders would not receive any more initial shares if the adjusted initial shares exceeded 85,000. The number of additional shares, based on the performance of Mayer Construction (the DCA subsidiary) from October 1, 1969 through December 31, 1972, was not to exceed 85,000 or the number of adjusted initial shares, if less than 85,000. Thus, the total maximum number of DCA shares to be exchanged for the Mayer shares was 170,000 shares of DCA stock which comprised the initial and additional shares. The additional shares were to be delivered to the Mayer shareholders on the post-closing date. However, the Mayer shareholders retained the right to demand delivery of the additional *177 shares at any time following the calculation and determination of the number of adjusted initial shares, which right they exercised. On delivery of the additional shares to the Mayer shareholders prior to the post-closing date, they were to deliver the additional shares to the escrow agents, Morris Sherman and David Beck. The additional shares were to be kept in a separate escrow fund to be held until the end of the escrow period which was to end no later than April 30, 1973. Stock dividends, shares resulting from stock splits and other distributions with respect to the shares held in the escrow fund were to be delivered to the registered owner and delivered by him to the escrow fund. While the shares were held in escrow, the shareholder had the right to vote such shares as though the shares had not been deposited into the escrow. The shareholder, however, was not allowed to assign or transfer any right to receive his additional shares under the agreement. On September 8, 1969, DCA's board of directors ratified the September 5, 1969 acquisition agreement. On September 30, 1969, as contemplated by the acquisition agreement, Barnegat and Coast stock was exchanged for stock of *178 Mayer Construction so that on October 5, 1969, all three Mayer companies were consolidated into one. Closing was held on October 7, 1969, at which time the shares of Mayer Construction were exchanged for shares of DCA as set forth in the acquisition agreement. At the closing, 85,000 shares of DCA stock were delivered to the former Mayer shareholders as their initial shares. Immediately thereafter, 25,000 of the 85,000 initial shares were delivered to Morris Sherman and David Beck as the escrow agents, to be held in escrow pending certification of Mayer Construction's consolidated net income for the fiscal year ended September 30, 1969. On January 5, 1970, Frank Ewart, Mr. Mayer's accountant, notified both Mr. Mayer and Alvin Sherman that his firm had completed its calculation of the consolidated net income of the Mayer companies for the fiscal year ended September 30, 1969, and that under the acquisition agreement the entire 85,000 initial shares were due to the former Mayer shareholders. These calculations were then verified by DCA auditors, and on July 15, 1970, DCA's board of directors authorized the release of the 25,000 initial shares escrowed at the closing. These shares *179 were delivered by the escrow agents, David Beck and Morris Sherman, to the former Mayer shareholders on August 4, 1970. On February 10, 1970, after notification that the number of adjusted initial shares had been determined to be 85,000, the former Mayer shareholders jointly notified Alvin Sherman to deliver all 85,000 of the additional shares to Mr. Beck. On April 3, 1970, DCA notified the Register and Transfer Company, DCA's transfer agent, to issue the 85,000 additional shares of DCA voting stock to the former Mayer shareholders. The shares were issued in the names of the former Mayer shareholders and subsequently delivered to Morris Sherman and David Beck as escrow agents. The former Mayer shareholders were the record owners of the 170,000 total shares of DCA common stock on April 6, 1970. On March 15, 1973, Frank Ewart notified Mr. Mayer and Alvin Sherman that the calculation of Mayer Construction's combined net income for the period October 1, 1969 through December 31, 1972 was complete, and based on those calculations, the former Mayer shareholders were entitled to the maximum 85,000 additional shares. [10] On April 5, 1973, DCA notified Morris Sherman and Mr. Beck that *180 its auditors had verified the calculations and instructed the escrow agents to release all escrowed additional shares together with all stock splits and stock dividend shares paid thereon to the former Mayer stockholders. On April 13, 1973, all such shares were released to Henry Mayer for distribution to the other former Mayer shareholders. Treatment of Escrowed Additional Shares
Prior to the April 13, 1973 release from escrow, the question of ownership of those escrowed shares had repeatedly presented itself. In May of 1970, Mr. Mayer was required to file a Form 4 with the Securities and Exchange Commission due to the fact that he had become the beneficial owner of *181 more than 10 percent of DCA's stock on delivery of the additional shares on April 6, 1970. During the period the additional shares were held in escrow, Henry Mayer was listed by DCA in its annual reports, proxy statements, Forms 10-K, and other SEC filings as the beneficial owner of both his initial and additional shares. [11] Furthermore, during the escrow period Mr. Mayer and the other former Mayer shareholders had the sole right to vote and did vote their total number of DCA shares, both initial and additional shares. In January 1971, DCA declared a 10 percent stock dividend and in June 1971 DCA declared a two-for-one stock split on its common stock. In April 1972, DCA declared a three percent stock dividend. When a dividend or stock split was declared, the transfer agent calculated the former Mayer shareholders' portion of the stock dividends or stock split based on their total share ownership of record, including *182 both initial and additional shares. The stock split or dividend certificates were mailed directly to the shareholders who then returned the certificates to David Beck and Morris Sherman to have the shares broken down between the amount issued with respect to the initial shares and those issued with respect to the additional shares. The escrow agents then had the transfer agent reissue certificates in the same names but in denominations divided between initial and additional shares. Those shares representing dividends or splits on the initial shares were returned to the former Mayer stockholders, while those representing dividends or splits on the additional shares were placed into the escrow account. On April 13, 1973, the number of additional shares together with the stock dividends and stock split shares declared thereon was 192,610. In 1971, DCA engaged in two public offerings of its stock and debentures. In the context of these offerings, pursuant to the acquisition agreement, Mr. Mayer and the other former Mayer shareholders were entitled to offer for sale a number of their DCA shares which would not exceed in proportion the number of DCA shares being sold by Alvin Sherman, *183 Irving Fishman, and Edward Lempka, referred to in the acquisition agreement as "the principal group." A dispute arose over whether the number of shares the former Mayer shareholders could register should be calculated on the initial shares alone or calculated on both the initial and additional shares. David Beck took the position that, notwithstanding the escrow arrangement, the additional shares had been validly issued and received for the account of the former Mayer shareholders, and voting and dividend rights related to the shares accrued to the former Mayer shareholders. Mr. Beck believed the beneficial ownership of the additional stock was vested in the former Mayer shareholders subject to divestment if the conditions of the earn-out were not met. Therefore, in Mr. Beck's opinion, the additional shares as well as the initial shares should be used in the computations. Morris Sherman, on the other hand, took the position that in computing the number of shares that could be registered, only the initial shares should be used in the calculation. In his opinion, the additional shares were not "received" by Mr. Mayer and the other former Mayer shareholders, and, therefore, could *184 not form the basis for calculating the number of shares to be registered. He believed the conditions placed on the additional shares made the beneficial ownership of the shares impossible to allocate or determine as between the shareholder and DCA, and the interest of both parties could not be fixed or computed until after December 31, 1972, the end of the earn-out period. Morris Sherman believed that until that time, the former Mayer shareholders possessed or retained beneficial interest in the additional shares in a proportion that could not be ascertained. The fact that the shareholders had the right to vote and receive dividends on the additional shares during the escrow period did not, in Morris Sherman's opinion, act to give them full beneficial rights in respect thereof. Ultimately, Mr. Mayer and other other former Mayer shareholders were permitted to calculate the number of shares to be registered for the sale by using both initial and additional shares. The Voting Agreement
Before he prepared his first draft of the acquisition agreement, Morris Sherman had told Alvin Sherman that including a provision for a board seat for Mr. Mayer could constitute "boot" and thereby *185 jeopardize the tax-free reorganization DCA and Mr. Mayer wished to achieve. After being informed by Morris Sherman that guaranteeing Mr. Mayer a place on the board of directors could not be included in the acquisition agreement, Alvin Sherman, without consulting with Morris Sherman, sent Mr. Mayer a draft of a proposed voting agreement to be signed by himself, Fishman, Lempka, and Mayer (hereinafter sometimes referred to as "the proposed voting agreement"). The proposed voting agreement was dated July 21, 1969, and stated: Dear Henry: This will confirm that upon the execution of the Agreement and Plan of Reorganization between Mayer Construction Co. and Development Corporation of America, you and we, have agreed to vote the shares of DCA respectively held by us, in the following manner: 1) So long as you shall hold at least 50% of the shares of DCA, received by you under the Agreement, we shall vote our shares, at all meetings held for the election of members of the Board of Directors of DCA, so as to insure that the Board of Directors will always contain one member nominated by you. 2) You shall vote all shares of DCA, held by you, at all meetings held for the election of *186 members of the Board of Directors of DCA, in favor of all directors as Alvin Sherman shall advise you. Very truly yours, Alvin Sherman Edward Lempka Irving Fishman Read and Accepted
This proposed voting agreement contained no signatures. In contrast, the cover letter which accompanied the proposed voting agreement had been signed "Al" with the following typed complimentary closing: Cordially, DEVELOPMENT CORPORATION OF AMERICA
Alvin Sherman President The cover letter that accompanied the proposed voting agreement stated that the agreement was "between the stockholders," to be signed at closing and a condition thereto, as would be the employment agreement. Although the employment agreement was executed on the October 7, 1969 closing date, neither the proposed voting agreement nor any other voting agreement was executed or signed on the closing date, or at any time before May of 1970. Neither the proposed voting agreement nor any other voting agreement was ever presented to, or acted upon, by the DCA board of directors. The proposed voting agreement was never submitted to Morris Sherman or David Beck until early May of 1970. [12] The proposed voting agreement *187 was never signed by Mr. Mayer, and there is no persuasive evidence that it was ever signed by Alvin Sherman, Irving Fishman, or Edward Lempka. *188 Mr. Mayer, whose corporation was to become a wholly owned subsidiary of DCA, wanted a seat on the DCA board of directors. Alvin Sherman, Irving Fishman, and Edward Lempka wanted Mr. Mayer, who would become the second largest shareholder of DCA, to vote for the principal group (Sherman, Fishman and Lempka) in any board election. On October 24, 1969, at a board of directors meeting, Mr. Mayer was elected as a director. Sometime prior to May 1970, Mr. Mayer received a proposed proxy statement, the first draft of which contained no reference to any voting agreement. On May 1, 1970, Mr. Mayer wrote to DCA's SEC counsel in reference to the proposed proxy statement. Enclosed with the letter was a copy of the proposed voting agreement dated July 21, 1969 that had never been executed. Mr. Diaz, vice president and treasurer of DCA, thereafter informed Mr. Mayer that a copy of an executed voting agreement was needed in preparation for the proxy statement. Mr. Mayer thereupon sent a copy of the July 21, 1969 proposed voting agreement to David Beck for his legal advice as to whether or not he [Mr. Mayer] should execute the agreement. [13]
*189 By letter dated May 11, 1970, Mr. Diaz sent Mr. Mayer an unsigned proposed revised voting agreement for his review. The proposed revised voting agreement dated April 1, 1970 included the addition of a third paragraph providing for the termination of the agreement by December 31, 1980. [14] There was another minor language change from the earlier proposed voting agreement. The June 21, 1969 proposed voting agreement began "This will confirm, that upon the execution of the Agreement and Plan of Reorganization between Mayer Construction Co. and Development Corporation of America, you and we . . .", whereas the April 1, 1970 proposed voting agreement began "This will confirm, that following the closing of the Agreement and Plan of Reorganization between Mayer Construction Co. and Development Corporation of America, you and we . . ." (Emphasis added.) *190 Shortly thereafter, by letter dated May 13, 1970, Mr. Diaz sent Mr. Mayer a copy of the April 1, 1970 revised voting agreement which had been signed by Alvin Sherman, Irving Fishman, and Edward Lempka. The signatures of Sherman, Fishman, and Lempka did not include any corporate titles, such as president or director, nor is there any evidence of a corporate seal or of any action by the DCA board of directors in regard to this revised voting agreement. Mr. Beck sent a reply to Mr. Mayer indicating that the proposed voting agreement of July 21, 1969 seemed to be in order. See n. 13, supra. Mr. Mayer then signed and sent to DCA's SEC counsel the revised voting agreement dated April 1, 1970. In his cover letter to the SEC counsel, Mr. Mayer referred to the agreement as being between "Mayer and DCA." The record does not establish that any voting agreement had ever been executed before this voting agreement, dated April 1, 1970, was executed in mid-May of 1970. A Notice of Annual Meeting of Stockholders (hereinafter "notice") containing a proxy statement was prepared for each annual stockholders' meeting. The proxy statement provided, among other things, that the shares represented *191 by the proxies received would be voted for all matters presented in the proxy statement, including the election of the nominees of the board of directors as directors. The notice also set forth the names of the nominees of management for whose election the persons named in the proxy intended to vote. It further provided that in the event that any such nominee should be unavailable for election, then the person named in the proxy would vote for the election of any other person as management might designate. The proxy cards specifically provided that the shareholder appointed Alvin Sherman, Edward Lempka, and Irving Fishman as said shareholder's attorneys and proxies with full power to vote said shareholder's shares. The card further stated: "THIS PROXY SOLICITED ON BEHALF OF THE MANAGEMENT OF THE CORPORATION." Noncumulative voting is provided for in the certificate of incorporation of DCA and, therefore, the owners of more than 50 percent of the common stock may elect all of the directors. At no time did Henry Mayer, Alvin Sherman, Irving Fishman, or Edward Lempka individually have enough shares to elect himself as a board member. Furthermore, the Sherman group, made up of Alvin *192 Sherman, Irving Fishman, and Edward Lempka, together did not have enough shares, without regard to any of the proxy shares, to elect themselves to the board. Henry Mayer, Alvin Sherman, Edward Lempka, Irving Fishman, and members of their immediate families owned in excess of 50 percent of DCA's outstanding stock on May 1, 1970, 37.5 percent on April 9, 1971, 29.2 percent on April 17, 1972, and 25.4 percent on April 17, 1973. From 1970 through 1973, the board of directors of DCA nominated Henry Mayer for director. At the annual meetings of the shareholders of DCA held in those years, the shareholders were listed in the board minutes as present "in person" or present "by proxy." At those annual meetings Alvin Sherman, Irving Fishman, and Edward Lempka voted the shares which they held individually as well as the proxies for Henry Mayer as director of DCA. Henry Mayer was elected to the board of directors from 1970 through 1973. The Advances from DCA to its Mayer Construction Subsidiary
DCA essentially serves as a management company for its operating subsidiaries and in this capacity it provides and/or arranges financing and lines of credit for its subsidiaries. From 1969 *193 through 1975 the primary sources of income of DCA were management fees from its subsidiaries and interest on loans to its subsidiaries. DCA's policy was to make an initial capital contribution at the time a subsidiary was formed or in the case of an acquired corporation, to treat the existing net worth of the acquired corporation as its capital investment. After the initial capitalization, all additional advances to the subsidiaries were considered by DCA to be loans to the subsidiary. DCA customarily charged interest to its subsidiaries on the loans it made, calculated at one point over the rate it paid to borrow the money from outside sources. As a result of the negotiations between Henry Mayer and Alvin Sherman, however, DCA agreed to arrange loans to the Mayer Construction subsidiary at the same rate DCA paid. During the negotiations, Henry Mayer had estimated that the initial loan requirement would be $ 400,000 and that over the following two years as much as $ 1 million would be required. Mr. Mayer advised DCA of the overall cash requirements for the Mayer Construction subsidiary, including use of funds, a monthly breakdown, and a description of the properties. No specific *194 amount, however, was agreed upon in the negotiations, and the final acquisition agreement did not specify an amount. The acquisition agreement provided that: DCA shall endeavor, consistent with its obligations and business requirements as they may exist from time to time, to make available to [the Mayer Construction subsidiary] such working capital [the Mayer Construction subsidiary] may require to sustain the normal growth and expansion of [its business]. The interest rate on loans by DCA to Mayer shall be at the same rate that DCA pays for its borrowed funds. The net asset value of Mayer Construction on September 30, 1969 was $ 459,243. The entry on the books of DCA to reflect the acquisition of Mayer Construction was as follows: Debit
Credit
Investment
Mayer Construction Company
$ 459,243
Capital stock
$  17,000
Paid-in capital
442,243
From October 7, 1969 through December 31, 1975, Mayer Construction was a 100 percent wholly owned subsidiary of DCA and filed consolidated income tax returns with DCA. Almost immediately after the acquisition and continuing through early 1975, DCA made advances of funds to Mayer Construction. *195 DCA charged interest on the advances at a rate keyed to its cost of borrowing as provided in the acquisition agreement. Money problems developed soon after the acquisition and became an area of recurring difficulties between DCA and its Mayer Construction subsidiary. In January 1970, DCA was faced with a tight money supply. The minutes of the meeting of the board of directors on January 21, 1970 indicated that DCA would be approximately $ 300,000 short of funds to meet expenses. The Mayer Construction subsidiary, faced with a similar situation, had projected cash requirements of $ 250,000 for January 1970, $ 100,000 for February, and $ 150,000 for March. These minutes also document the beginnings of the conflict between Alvin Sherman and Henry Mayer, which eventually erupted into open hostility and multiple lawsuits. In response to the projected requirements, Alvin Sherman requested that Mr. Mayer determine the absolute minimum needs of Mayer Construction and Mr. Samuels was called in to give his recollection of what his original impression of Mayer Construction's needs were. Samuels indicted that originally the amount presented was $ 750,000, but this figure was later revised *196 to include $ 400,000 in increased lines of credit extended to Mayer Construction. Alvin Sherman did not recall ever making a commitment for a specific number of dollars and said the discussion of Mayer Construction's needs was only in a general sense. Mr. Mayer, on the other hand, indicated that prior to signing the final agreement, he had given DCA a copy of his cash requirements and that he believed such a commitment had definitely been given to him. Alvin Sherman believed that Mayer Construction's working capital should be generated from, among other things, increased cash flow from the subsidiary's own operations. Mayer Construction's operations were set up like a factory, with many different housing projects at different stages of development and with individual units or houses within a given project in various stages of construction. Mayer Construction was a large integrated company, handling every aspect of the projects, including sales of the houses to the ultimate home buyer. Mr. Mayer found it difficult to accurately project cash flow for the expanding business. Thre was no excess cash for the first two years because all surplus money went into inventory buildup, *197 i.e., land acquisition. It generally required two years to prepare a subdivision for operation and, therefore, a substantial land inventory was required. Mr. Mayer predicted that it would be July or August of 1970 before the cash flow would reverse itself. The correspondence between Alvin Sherman and Henry Mayer through October 6, 1970 indicates the lack of any precise understanding between the two, not only as to the amount of money committed to the Mayer subsidiary by DCA but also as to the proper characterization of the advances. Alvin Sherman made requests to Mayer Construction for repayment of loans plus the interest. Mr. Mayer, on the other hand, requested clarification from DCA as to whether the advances constituted short-term loans or long-term investment. The advances were repeatedly referred to as loans in many of the letters between Mr. Mayer and Alvin Sherman, in the minutes of the board of directors meetings and executive committee meetings, and were reflected as liabilities on the financial statements of DCA and Mayer Construction for the years 1970 through 1975. The disagreement between Mr. Mayer and Alvin Sherman was whether the advances were to have been short-term *198 requiring repayment of principal within a short period of time, such as five months, or whether they were to be long-term with repayment of only the interest for a longer period of time, such as two years. In September of 1970, Mr. Mayer requested from DCA a moratorium on repayment of the principal, interest, and management fees that were due to DCA from Mayer Construction. [15] Alvin Sherman denied the request, indicating that it would not have been in the best interest of the stockholders. Mayer Construction was a rapidly expanding subsidiary at that time. Ocean County, New Jersey was the fastest growing area of New Jersey and one of the fastest growing areas in the country. In the early 1970's the housing in central and northern New Jersey had become so expensive that many people *199 decided to make a longer commute in order to purchase more affordable homes in southern New Jersey. The Mayer subsidiary set a production goal of 300 units per year by 1971, 1,000 units by 1975, and ultimately 3,000 units per year. In order to reach that ambitious objective it was necessary for Mayer Construction to adopt a long-term plan to develop a large land inventory. DCA continued to advance large sums of money to Mayer Construction and to guarantee third-party loans to the subsidiary. DCA's records indicate that by the end of December 1971 DCA had advanced $ 2,090,000 to Mayer Construction and had received repayments of $ 190,500. By the end of 1972, the total amount that DCA had advanced was $ 7,721,522, and the total repayment was $ 308,500. By the end of July 1974, a total of $ 20,748,425.38 had been advanced, with a repayment totaling $ 3,190,675.98. The Mayer subsidiary from time to time signed notes acknowledging its indebtedness to DCA. Unless there was an unusual risk involved, DCA generally did not find it necessary to secure its loans to its subsidiaries. In August 1972, Robert Klein, vice president of Mayer Construction, executed a note dated June 30,1972 *200 in the amount of $ 5,020,074 consolidating all previous notes executed up to and including June 30, 1972. A note in the amount of $ 650,000 dated July 12, 1972 also was executed, and Klein requested that all other notes be returned to Mayer Construction marked satisfied, especially those which were in the form of mortgage notes. On October 3, 1974, a note to the order of DCA in the amount of $ 16,316,458.97 consolidating all loans from DCA to Mayer Construction through October 3, 1974, payable on demand with interest, was executed by Mayer Construction and secured by a mortgage. On October 15, 1974, a similar note in the amount of $ 150,000 also was executed by Mayer Construction and secured by a mortgage. As of December 31, 1975, the amount of advances made by DCA to its Mayer subsidiary was $ 16,466,831.42, and the accrued and unpaid interest on that amount was $ 4,538,991. Both of the mortgages executed by Mayer Construction in October of 1974 contained provisions subordinating DCA's lien to increases and/or extensions of loans to Mayer Construction from third-party sources. None of the advances from DCA to Mayer Construction had any requirement for the creation of a sinking *201 fund or other source for repayment. Repayment was to come from the cash flow generated by the sale of homes as subdivisions were developed. Most advances had no fixed schedule for repayment. From 1969 through 1974 the "Stockholders Equity Account" was reflected on the financial statements of Mayer Construction [16] as follows: Year
Amount
1969
$  478,192 1970
699,497 1971
1,111,550 1972
2,320,181 1973
367,129 1974
(11,703,282)
From October 7, 1969 through the end of 1975, Mayer Construction's financial statements reflected its 13,575 shares of issued, no-par-value common stock, in the amount of $ 186,259, which was the basis of the shares of stock in the hands of Mr. Mayer and the other former Mayer stockholders at the time of the acquisition by DCA in 1969. Anticipated Problems in New Jersey and Mr. Mayer's Ouster
In 1972 and 1973, Mayer *202 Construction encountered several unanticipated legal and economic obstacles to its development of certain of its properties. By that time the Mayer subsidiary had acquired some 4,000 acres of land in the southern New Jersey area, such land acquisitions or "land banking" having been approved by the DCA board of directors. In mid-1972, the Lacey Township successfully obtained an injunction to stop building in the area. In 1973, there was a moratorium related to sewage on the development of certain Mayer Construction property, and the U.S. Attorney filed suit against Mayer Construction in regard to its Pebble Beach subdivision. Also in 1973, the Arab oil embargo caused gasoline prices to rise rapidly. Because of the energy crisis and its possible effect on the building industry, the executive committee of DCA agreed that an ultraconservative attitude be taken with regard to the cash flow requirements and the development of new projects. With the winter of 1973-1974 came the break in the relationship between DCA and Henry Mayer. Sales of houses were slow in the New Jersey area. An inspection of the Mayer Construction operation in November 1973 and a review of the income and *203 cash flow projections led to a downward revision of the income projection for the Mayer subsidiary for the quarter ended December 31, 1973. Carl Palmisciano became president of Mayer Construction in December 1973, having taken the job because Mayer Construction was regarded as a great success and a giant in the industry. Within a short time, he began to learn that there were major problems in the company. There were approximately 145 employees at Mayer Construction at that time. At some point Palmisciano came to believe that, as a general contractor, Mayer Construction primarily should use subcontractors and, therefore, the large number of employees was unnecessary. At some point he also found large cost overruns. Inspection of Crosswinds Condominiums, a project with a $ 1 million total budget, revealed that only the earth work had been completed and the costs had already exceeded $ 1 million. Mr. Mayer himself had reported a cost overrun back in May or June of 1973. Palmisciano estimated that the cost overrun on that project alone could conceivably be $ 1 million. Palmisciano at some point also disagreed with Mr. Mayer's method of allocating cost. Palmisciano believed *204 greater costs should be assigned to the fully improved waterfront lots and not doing so created a distortion which showed extraordinary profits which could prove to be hypothetical and unjustified. The record does not disclose exactly when Mr. Palmisciano learned these various things. Sometime before December 19, 1973, there was a meeting attended by Mr. Palmisciano, Mr. Mayer, Mr. Diaz, and Alvin Sherman. As a result of that meeting Mr. Sherman announced at the board meeting on December 19 a decision to reduce the number of employees and liquidate unnecessary buildings, such as a warehouse. Palmisciano ultimately reduced the number of employees from 145 to approximately 50. He also tried to find ways of disposing of the buildings and warehouses. In January 197, Alvin Sherman circulated to the directors of DCA a report he had prepared about Henry Mayer. [17] The report stated that Mr. Palmisciano had discovered losses in the Mayer Corporation which were attributed to the negligence of Henry Mayer. [18] The minutes of the meeting of the executive committee on January 16, 1974 indicated that the resignation of Mr. Mayer was required and that it was decided that DCA would repurchase *205 Mr. Mayer's stock if no fraud on the part of Mr. Mayer was proved. The minutes also stated that DCA would terminate Mr. Mayer's employment agreement. *206 Alvin Sherman called Henry Mayer in early March 1974 to demand that all of the DCA stock held by the Mayer family be returned to DCA and to inform Mr. Mayer that his employment would be terminated. On March 28, 1974, at a special meeting at DCA's board of directors, Henry Mayer was suspended as a director of DCA and his employment officially terminated. At the meeting Henry Mayer made a general denial of the charges set forth in Alvin Sherman's report. See n.18, supra. At that meeting or shortly thereafter, Alvin Sherman threatened to ruin Mr. Mayer financially, threatening, among other things, to cause him a very large tax liability by undoing the 1969 tax-free "B" reorganization and claiming Mr. Mayer received some $ 4,000,000 of ordinary income in connection with the DCA stock. He also made threats about imputed interest income to Mr. Mayer, but that threat apparently occurred later. In April 1974 Henry Mayer brought three separate actions against DCA and members of its board of directors in the United States District Court for the District of Delaware, alleging in general terms (a) breach of his employment contract, (b) breach of the provisions of the acquisition agreement, *207 and (c) violations of the Securities Act of 1933. DCA answered and filed counterclaims against Mr. Mayer in these various actions. In May, DCA filed suit in the United States District Court for the Southern District of Florida against Henry Mayer, alleging generally SEC violations and mismanagement of the Mayer subsidiary. On June 18, 1974, DCA and the individual defendants in the Delaware actions filed motions to dismiss for failure to state a claim upon which relief could be granted and/or lack of proper venue. They also filed motions to transfer the cases to Florida. These motions by DCA and the individual directors were denied. [19] Ultimately, the Florida cases were moved to Delaware, and all of those cases were settled without a trial on the merits. Unfortunately, that did not end litigation, as will be discussed below. *208 Liquidation of Mayer Construction
During the early part of 1974, DCA incorporated a wholly owned subsidiary known as Development Corporation of America, Northeast, Inc., with an authorized capital of 2,000 shares of common stock. On April 5, 1974, the name of the corporation was changed to "Development Corporation of America of New Jersey" via amendment to its certificate of incorporation. On May 20, 1974, the certificate of incorporation was amended again to change the corporation's name to DCA of New Jersey, Inc." DCA decided that Mayer Construction was to be restructured and ultimately restored to a profitable basis. At a meeting of the executive committee of DCA in May 1974, Mr. Palmisciano reported on the activities of New Jersey. He reviewed with the committee each of the subdivisions, their inherent problems, the inventory on hand, and discussed the liquidation of certain properties. The committee agreed that certain land should be sold, while other property, such as the 97 lots in Cranberry Hill, should be retained so that the company could "continue to be a building company." Throughout 1974, Palmisciano attempted to reduce inventory and personnel and tried *209 to sell office buildings. Selling bulk land holdings proved to be difficult. The usual purchasers of large tracts of land, other land developers and builders, had been impacted with the same economic and environmental pressures as Mayer Construction. These other land developers and builders also were trying to sell their large land holdings. With regard to the sales of condominiums, Palmisciano also found it difficult to find lenders who would give permanent financing to condominium projects. The Mayer subsidiary continued to build subdivisions under construction that were subject to performance bonds requiring such completion. In December 1974, the board of directors of DCA decided to stop further payments when due on certain mortgaged property located in both New Jersey and Florida. The value of the parcels of land involved had become depressed to such a level that it was in the company's best interest to discontinue the payments and let the properties revert to their former owners without going through legal foreclosure, if possible. By January 1975 there was concern in regard to certain parcels of optioned land that, under the existing economic conditions, DCA and its *210 operating subsidiaries would not be using land as fast as they had in the past. The year 1974 had been one of the worst in the housing industry since the great depression of the 1930's. Interest rates were up, costs had risen due to inflation, and there was a shortage of mortgage funds. DCA reported to its stockholders that these economic conditions caused a company-wide re-examination of the feasibility of certain projects. The annual report to stockholders further stated that although the end of 1974 indicated a gradual improvement in sales, a full resurgence would have to await a decline in the existing inventory of unsold residences. The stockholders were told that Congress had provided a special tax credit for home buyers to help reduce the existing inventory of unsold residences nationwide. The board of directors decided not to purchase some optioned properties intended for future development where further capital expenditures were felt to be imprudent. Land inventories were reappraised due to the decline in property values. Where the appraisal indicated the net realizable value of the property was less than cost, a write-down or reduction in the book value of the *211 property was taken. Operating costs were reduced wherever possible. DCA's window manufacturing division which had been unprofitable was sold. As a result of these measures, overhead was reduced, cash flow increased, and the balance sheet improved. If the write-downs had not been considered, the operations for 1974 would have shown a pre-tax profit to DCA of around $ 5 million. DCA had improved liquidity and was embarking on a program to develop new markets, specifically targeting projects in which government subsidized mortgage programs could be utilized. DCA's recent growth before 1974 had been in condominiums, but in 1974 the condominium market had been overbuilt, particularly in Florida. Thus DCA's largest condominium market, Florida, was the most distressed of all. The biggest deterrent to sales in southern Ocean County in New Jersey had become in 1974 the cost of commuting. Palmisciano was actively looking in other locations for possible development. If Mayer Construction could dispose of its bulk land holdings and sell the miscellaneous properties such as the office building and warehouse property, Palmisciano believed Mayer Construction could then set up offices *212 elsewhere and "try to operate the southern Ocean County area as a satellite operation." he Honorable Murray Schwartz, United States District Judge in the Delaware suit, denied the defendants' various motions and filed an opinion on March 21, 1975. See n.19, supra. In June of 1975, the board of directors discussed the possibility of a settlement of the pending litigation with Henry Mayer. At a special meeting in August, the board of directors agreed to a proposed settlement which provided for the following: Henry Mayer would exchange 180,000 shares of DCA stock for certain parcels of land, the net value of which was $ 438,713. The balance of shares owned by Mr. Mayer would be contributed to a charity and the shares held by the Mayer children would be liquidated within 30 months. Henry and Marianne Mayer were to receive their vested profit-sharing contributions. Another lawsuit in a New Jersey state court had been brought in regard to the profit-sharing plan. Mr. Mayer would receive $ 35,000 in satisfaction of the remainder of his employment contract. The parties would execute general releases to each other, and DCA agreed to phase out the use of the Mayer name within 30 *213 months. The settlement between Henry Mayer and DCA was not finalized until January 5, 1976, when the terms of the releases to be signed by the litigants were finally agreed upon. On October 31, 1975, at a special meeting, the board of directors reviewed the proposed settlement with Henry Mayer. It was stated that in view of the termination of the disputes and the several lawsuits with the Mayers which had seriously disrupted the normal operations of the company, and in view of the insolvent condition and doubtful prospects of the Mayer subsidiary, that Mayer Construction should be liquidated. It was also stated that heavy losses together with the erosion of land inventory values had led to an insolvent status requiring substantial additional advances and infusion of additional working capital if the New Jersey operations were to continue in a meaningful way. The board decided it was in the best interest of company to divest itself of large tracts of land inventories then held by Mayer Construction either by permitting foreclosure by the mortgagees or by reconveyance of the property to the mortgagees. The board also stated that it was concerned about liability for any undisclosed *214 actions resulting from Henry Mayer's mismanagement, and that settlement with Mr. Mayer would preclude DCA from suing Mr. Mayer in any such claims. See n.18, supra.
The DCA board of directors expressed the view that continued use of the Mayer name had become undesirable and potentially embarrassing. The board stated that it would "be prudent to arrange for the continuation and winding down of all future activities in New Jersey through entities other than Mayer Corporation." The board indicated that DCA of New Jersey, Inc., formed earlier that year, was available for the "carrying and winding down" of the Mayer activities in New Jersey. The board stated that the wiser course for DCA "would be the termination of the operations of the Mayer Corporation and its early liquidation" and that the completion of business activities within the New Jersey area following the liquidation of Mayer would be conducted and financed through DCA of New Jersey, Inc. The resolution finally passed by the board stated: RESOLVED, That the Board of Directors of Development Corporation of America, as the sole shareholder of the Mayer Corporation, does hereby recommend to and request of the Board *215 of Directors of The Mayer Corporation that immediate action be taken towards the termination of the operation of The Mayer Corporation prior to the close of calendar year 1975, and that its assets, subject to existing liabilities, be distributed in complete cancellation and redemption of its outstanding shares of capital stock; and it was further RESOLVED, That in connection with the termination and liquidation, and in pursuance thereof, The Mayer Corporation is hereby advised and requested that there be transferred to DCA of New Jersey, Inc. as the initial distribution in liquidation, those parcels of real estate more particularly described in Exhibit "A", annexed hereto, said transfers to be for the account of Development Corporation of America as the sole shareholder of The Mayer Corporation, and that the distribution of the balance of the Mayer assets, subject to its liabilities, be transferred to DCA of New Jersey, Inc. as quickly as practicable in completion of the liquidation, also for the account of Development Corporation of America; and it was further, RESOLVED, That the officers and directors of DCA of New Jersey, Inc. are hereby requested to transfer and convey to Mr. *216 Henry Mayer or his assigns, all of those parcels of real estate listed and described in exhibit "A", hereto, said transfers and conveyances to be made by DCA of New Jersey, Inc. as agent for, and for the account of, Development Corporation of America in the discharge of its obligations under the Settlement Agreements between Development Corporation of America and Mr. and Mrs. Henry Mayer dated August 25, 1975; * * * * * * On December 12, 1975, pursuant to the October 1975 resolution, the following assets of the Mayer subsidiary were transferred to DCA of New Jersey through deeds and assignments executed between the Mayer subsidiary and DCA of New Jersey: (a) unsold portion of Crosswinds Condominium No. 1; (b) unsold portions of Georgetown Condominium No. 1; (c) all property owned by the Mayer subsidiary in the county of Ocean with the exception of those tracts subject to mortgages held by Barnegat Beach Company, Ltd., Finninger and Hovnanian; (d) one lot in the township of Berkley; (e) unencumbered properties; (f) all properties encumbered by mortgages; (g) all personal property and fixtures belonging to the Mayer subsidiary; (h) all leases in which the Mayer subsidiary was landlord; *217 (i) all rights, liabilities, and obligations of the Mayer subsidiary as grantor under a master deed for Crosswinds Condominium No. 1; (j) all rights, liabilities, and obligations of the Mayer subsidiary as grantor under a master deed for Georgetown Condominium No. 1; (k) all contracts of sale of dwelling units existing under construction or to be constructed; (l) all contract rights and liabilities of the Mayer subsidiary on all existing written and oral contracts arising out of normal business operations; and (m) any and all leases, whether residential or commercial properties, in which the Mayer subsidiary was the landlord pertaining to real estate owned by the Mayer subsidiary in Ocean or Camden Counties in the State of New Jersey. As of December 31, 1985, all assets and liabilities of the Mayer subsidiary except for the properties not intended to be kept (Barnegat, Finninger and Hovnanian) had been transferred to DCA of New Jersey. The fair market value of the net assets received by DCA of New Jersey as of that date was $ 5,387,150. All of the Mayer subdivisions then under construction were subject to performance bonds and required completion by DCA of New Jersey. Two properties *218 retained by the Mayer subsidiary were disposed of pursuant to agreements date April 30, 1976. The Mayer subsidiary deeded back certain mortgage premises to Hovnanian in exchange for cancellation of the mortgage. In settlement of a pending foreclosure proceeding, the Mayer subsidiary agreed to deed over to Barnegat Beach Company, Ltd., certain mortgaged premises in satisfaction of a mortgage held by Barnegat. In his address to the shareholders at DCA's 1976 annual shareholders' meeting, Alvin Sherman discussed the adverse effect the recession had had on housing in all of DCA's markets, including New Jersey. He reported that "Our New Jersey division is still an area of substantial problems, but the losses have been diminishing and with any meaningful sales improvement, could turn positive by next year. Much inventory has been liquidated in an effort to reduce carrying costs in New Jersey to more realistic levels." At regular board meetings of DCA through December of 1976, discussions covered loans to DCA of New Jersey from the parent company, establishment of a revolving loan agreement, expansion plans for the New Jersey market, and approval of the purchase of the property of *219 Village Harbor by DCA of New Jersey. Carl Palmisciano, in his report of September 3, 1976, used fictitious companies A and B to describe the operations of DCA of New Jersey for the purpose of giving "Management a better insight as to the condition of the New Jersey division." Company A was described as a non-operating company with the assets and liabilities outstanding which resulted from the old days. Company B, on the other hand, was "an operating company in the business to build residential units." Company A sold to Company B fully developed lots. Company B had its own overhead, and a break-even point of 120 units, at which point it would show no loss, no profit. A break-even or small profit was anticipated for Company B for 1976. A projection for 1977 delivery of 150 units would result in a quarter of a million dollar profit for Company B in the New Jersey division. From this analysis Palmisciano concluded, "[i]fNew Jersey did not have the problems which it inherited, it would be a money-making company even for as few as 120 units a year, and I would like to think that Management would understand and think of the New Jersey division in the future as a profit center again, *220 or should I say for the first time." By January 1977, Palmisciano informed DCA that the New Jersey division had become a lot healthier and more solid in 1976 than appeared on the surface. Palmisciano reported. As relates to the Mayer Corporation, all assets have been eliminated and the Mayer Corporation now can be put through the process of dissolution. With the problems of Barnegat Beach Company, Ltd. resolved in 1976, we have only BLT and Finninger to clear up and that, hopefully, will all be finalized in 1977. If my last statement is correct it would then mean we can close our book on the Mayer Corporation forever and DCA of New Jersey, Inc. would remain as a very healthy building company with very substantial assets.
The Finninger mortgage in the amount of $ 1,366,176.73 was foreclosed through a final judgment and subsequently sold at a sheriff's sale on September 20, 1977. By March 1977, the local newspaper headlines reported that the price for a gallon of gasoline was expected to reach $ 1. Palmisciano believed such an increase would "blow [DCA of New Jersey] out of the water again." Having advised DCA of his resignation, Palmisciano made his recommendations *221 on the handling of DCA of New Jersey, Inc., which included expanding DCA of New Jersey's base of operation to make it less vulnerable to the pitfalls experienced in the remote areas of New Jersey. In reviewing the development of DCA's operations in New Jersey, Palmisciano stated that in 1972 and 1973, Mayer Corporation did well because people believed it was more economical commuting longer distances than buying more expensive housing closer to the workplace. When the energy crisis in the winter of 1973-1974 cut off the primary residence market, it was thought to be a temporary situation and a respectable rate of sales was still expected. By early 1977, it was evident that southern Ocean County was no longer an areas in which to sell to primary home buyers. Palmisciano noted, however, the market that would still exist in the area was lower cost housing, which would attract the vacationer, second home buyer, or retiree. There was a substantial market for a senior citizens' project. Palmisciano recommended that DCA of New Jersey continue to investigate properties and given serious consideration to setting up an operation in the metropolitan Philadelphia area. In November of *222 1978, DCA of New Jersey organized a new subsidiary, DCA of New Jersey Realty Company. The purpose of the subsidiary was to allow DCA of New Jersey to sell its own properties and thereby reduce costs. DCA's 1978 annual stockholders' report stated in that in 1978 for the first time in several years, the New Jersey division did not report losses, and that some degree of profitability in New Jersey was expected in 1979. In early 1979, operations in New Jersey were again adversely affected by a second gasoline shortage which drove prices up above $ 1 per gallon and caused rationing. These difficulties were later compounded by rising interest rates. In February 1979, the board of directors of DCA discussed the feasibility of liquidating the New Jersey holding by donating certain appraised properties and taking a charitable deduction. This idea was discussed again and unanimously approved at the March 28, 1979 board meeting. The concept was to remove from DCA of New Jersey the assets the parent company intended to utilize and to put those assets into a new corporation. The assets that DCA did not need would be retained by DCA of New Jersey and the stock in DCA of New Jersey would *223 be contributed to a university in order to obtain charitable contributions deductions. In October 1979, DCA of New Jersey changed its corporate name to CentrOcean Land Corp., Inc. (hereinafter CentrOcean). Meanwhile, Georgetown Condominium, a wholly owned subsidiary of the Mayer Corporation, which had remained inactive since its incorporation in February 1973, changed its corporate name to DCA of New Jersey, Inc., in order to activate it as the operating company for DCA in New Jersey. With the exception of the tracts of land it planned to donate to the University of Miami, CentroOcean then transferred all of its operating assets, including equipment, personnel, and all land inventories to the new DCA of New Jersey. Thus, DCA could make the charitable contribution while at the same time retaining the name DCA of New Jersey. DCA then donated 800 of its 2,000 shares in CentrOcean to the University of Miami and claimed a charitable deduction for the year 1979 of $ 920,193, based on the fair market value of the stock. During 1980, DCA donated the remaining 1,200 shares in CentrOcean to the University of Miami and claimed a deduction for the year 1980 of $ 907,375, again on the fair *224 market value of the stock at the time. In December 1979 there was an overall change in the operating philosophy of DCA of New Jersey which entailed the discontinuance of the entire building operation. An active lot sale program was begun whereby fully improved lots were offered to builders and individuals. The lots were marketed through DCA Realty. It was hoped that this change would allow DCA of New Jersey to remain "a viable operating entity during the period of anticipated decline in housing activity in the early 1980's." Tax Positions and Further Litigation
On its 1973 Federal income tax return, DCA claimed a $ 596,173 deduction for unstated interest expenses. This was based on, among other things, DCA's contention that the DCA shares exchanged in the 1969 acquisition of the Mayer companies were not voting shares because of the alleged voting agreement between DCA and Mr. Mayer. That contention also meant that the 1969 transaction was not a tax-free reorganization under section 368(a)(1)(B) and thus DCA would have a stepped-up cost basis in its Mayer subsidiary stock rather than a carryover basis. As a result of the tax consequences to Henry Mayer from DCA's *225 tax positions, Mr. Mayer and Marianne Mayer filed another suit against DCA and a number of the directors, including Alvin Sherman, in the Federal District Court in New Jersey, for breach of contract. In October and November 1980, that case was tried before Judge Meanor in a non-jury trial. [20] On April 22, 1981, Judge Meanor ruled in favor of the Mayers and entered an order on August 10, 1981 to the effect that under the Agreement and Plan of Reorganization dated September 5, 1969, DCA agreed to forgo its right to claim a tax deduction for imputed interest expenses arising out of the reorganization regardless of any potential entitlement under the Internal Revenue Code. Judge Meanor ruled that DCA's imputed interest expense deduction on its 1973 tax return therefore breached the agreement. He further ruled that the parties to the acquisition agreement intended the transaction as structured in the agreement to be a tax-free organization under section 386(a)(1)(B) and agreed that neither side would take any action or position inconsistent with that agreement. Therefore, Judge Meanor ruled that DCA's position that the DCA shares received by the Mayers were not voting shares, the position *226 DCA argued to the Internal Revenue Service in support of its imputed interest deduction, further breached the agreement. Therefore, DCA would be required to indemnify the Mayers for any and all damages which may be incurred by them as a result of DCA's breaches, including but not limited to all taxes, interest, and penalties which may be found due and owing by the Mayers to the Internal Revenue Service.[21] Judge Meanor also fond that the general release executed by the Mayers in January of 1976 in settlement of the Florida and Delaware lawsuits foreclosed the Mayers from recovering any damages, losses, or expenses of any nature incurred by reason of DCA's filing of its 1975 Federal corporate income tax return. Judge Meanor's opinion was affirmed in an unpublished opinion by the United States Court of Appeals for the Third Circuit. (688 F.2d 822 (3d Cir. 1982).) *227 The litigants in the Florida and Delaware lawsuits had finally agreed upon the terms of their releases in early January of 1976. DCA did not file its Federal corporate income tax return for 1975 until September of 1976. On the same theories it relied on for its imputed interest deduction on the 1973 return, DCA, on its 1975 return, claimed a $ 4,265,731 loss as a result of its liquidation of the Mayer subsidiary in 1975. Respondent disallowed the unstated interest deduction of $ 596,173 claimed on the 1973 return because the transaction did not come within section 483 of the Internal Revenue Code. Respondent also disallowed the 1975 claimed liquidation loss of $ 4,265,731 because a liquidation under section 332 had not been established, a loss under section 165(g) or 166 had not been established, and the amount of such a loss had not been established. It is DCA's position that as a result of Judge Meanor's decision, DCA is effectively precluded from claiming a deduction for the imputed interest. As a result DCA no longer challenges respondent's determination of the 1973 deficiency (see n.21, supra), but the 1975 year raises a host of issues, including *228 the imputed interest issue. ULTIMATE FINDINGS OF FACT 1. The proposed voting agreement of July 21, 1969 was never executed. Any informal understanding or "gentlemen's agreement" on voting was an agreement among Henry Mayer, Alvin Sherman, Irving Fishman, and Edward Lempka in their individual capacities as shareholders, and DCA was not a party thereto. 2. The voting agreement dated April 1, 1970 was executed in mid-May of 1970 by Henry Mayer, Alvin Sherman, Irving Fishman, and Edward Lempka in their individual capacities as shareholders, and DCA was not a party thereto. 3. Henry Mayer and the other former Mayer stockholders were the beneficial owners of the additional shares of DCA stock as of April 6, 1970 when the additional shares were issued to them and placed in the escrow account. 4. DCA's advances to its wholly owned Mayer Construction subsidiary were contributions to capital rather than loans. OPINION In 1969 petitioner, Development Corporation of America (hereinafter petitioner or "DCA"), acquired all of the stock of the Mayer companies in a stock-for-stock exchange that the parties intended to be a tax-free exchange under section 368(a)(1)(B). DCA *229 was at all times a publicly held corporation; the Mayer companies, which were to become a wholly owned subsidiary of DCA, were owned by Henry Mayer and his family. Since this was to be a "corporate marriage," both parties wanted the acquisition agreement carefully structured as a tax-free "B" reorganization. DCA acted through its president, Alvin Sherman; the Mayer companies acted through Mr. Mayer. Each party to the transaction was represented by competent tax counsel who understood the legal requirements for a tax-free "B" reorganization, carefully counseled his respective client on the danger of any "boot" which might jeopardize the tax-free transaction the parties wanted. The tax counsel drafted and the parties later executed an acquisition agreement that expressly provided that it was intended to be a tax-free "B"" reorganization, an exchange solely of stock for stock and for no cash or other property, and that expressly provided that neither party would take any action or position inconsistent with that intention. Unfortunately the corporate marriage did not prove to be a happy one. Instead of living happily ever after, DCA, Alvin Sherman, and some of the other directors, *230 on the one hand, and Mr. Mayer, on the other hand, seem to have litigated ever after. After generally unsuccessful litigation with Mr. Mayer in the state court of New Jersey, in the Federal District Courts of Florida, Delaware, and New Jersey, and in the United States Court of Appeals for the Third Circuit, DCA is now in this Court asking us to hold that the 1969 transaction was not a tax-free "B"" reorganization. The first issue for decision is whether petitioner's acquisition in 1969 of all the stock of Mayer Construction constituted a tax-free reorganization under section 368(a)(1)(B). [22] Generally, a reorganization under section 368(a)(1)(B) is the acquisition by one corporation (the acquiring corporation) of stock in another corporation (the acquired corporation), if immediately after the acquisition the acquiring corporation has control of the acquired corporation. Sec. 368 (a). Further, the acquisition of the acquired corporation's stock must be in exchange solely for voting stock of the acquiring corporation (or in exchange solely for voting stock of a corporation in control *231 of the acquiring corporation). Sec. 368(a)(1)(B). See Helvering v. Southwest Consolidated Corp.,315 U.S. 194 (1942). If the acquisition qualifies as a reorganization under section 368(a)(1)(B), no gain or loss is recognized by the acquiring corporation or by the stockholders of the acquired corporation on the exchange. Secs. 354(a), 361(a). In addition, the acquiring corporation's basis *232 in the acquired corporation's stock is the same as it would be in the hands of the acquired corporation's shareholders before the acquisition. Sec. 362(b). If petitioner's acquisition of Mayer Construction qualifies as a tax-free reorganization under section 368(a)(1)(B), petitioner would take a carryover basis in the Mayer stock under section 362(b) of $ 186,259. However, if the acquisition does not qualify under section 368(a)(1)(B), then petitioner would take a "cost" basis in the Mayer stock under section 1012. [23] The amount of any worthless securities deduction that petitioner might be entitled to depends on its basis in the Mayer stock. *233 As noted earlier, despite the express terms of the acquisition agreement, petitioner argues that its acquisition of all of the stock of Mayer Construction did not qualify as a tax-free reorganization under section 368(a)(1)(B) because the exchange violated the "solely for voting stock" requirement. Specifically, petitioner contends that as part of the acquisition Henry Mayer was guaranteed a seat on petitioner's board of directors. Petitioner argues that this constitutes receipt by the Mayer shareholders of property other than DCA voting stock, i.e., "boot," therefore invalidating the acquisition's treatment for Federal tax purposes as a tax-free reorganization under section 368(a)(1)(B). Additionally, petitioner claims that by forgoing its right to claim an imputed interest deduction in 1973 with respect to the additional shares, petitioner had contractually agreed to satisfy Mr. Mayer's personal tax liability that would have arisen from the corresponding interest income. Here petitioner in essence is claiming that its breach of contract, as determined by Judge Meanor in the New Jersey Federal District Court litigation, constitutes "boot." See n. 21, supra. Stated in alternative *234 and more palatable terms, petitioner argues that its forbearance to claim an imputed interest deduction under section 483, to which, it says, Judge Meanor found it was entitled, constitutes the receipt of "boot" by Mr. Mayer and the other former Mayer shareholders. In the New Jersey lawsuit, United States Federal District Court Judge Meanor ruled that the Mayers and DCA reached an understanding that was ultimately expressed in the acquisition agreement that regardless of any potential entitlement DCA would forgo its right to claim an imputed interest deduction with respect to the additional shares. The Federal District Court held that DCA breached the acquisition agreement when it claimed an imputed interest deduction on its 1973 tax return, and on appeal that holding was affirmed by the Third Circuit. As a result of that litigation, petitioner is no longer contesting the deficiency determined for 1973, but apparently still contends that it was legally entitled to such an imputed interest deduction. See n.21, supra. Petitioner claims the Federal District Court found that DCA was validly entitled to the imputed interest deduction. That is not correct. Rather, the Federal *235 District Court specifically stated that it was not determining whether the acquisition agreement, as drafted, sufficiently complied with Example (8) of section 1.483-1(b)(6), Income Tax Regs., so as to avoid any imputed interest on the transaction, nor was it determining any other tax issues before the Tax Court. Mayer v. Development Corp. of America,541 F. Supp. 828, 834 n.9, 848, n.17, 860-861 (D. N.J. 1981), affd. without published opinion 688 F.2d 822 (3d Cir. 1982). Moreover, the evidence before this Court establishes that the escrow delivery of the additional shares was specifically intended by both parties to the acquisition agreement to avoid any imputed interest under section 483. Petitioner argues that the parties' agreement somehow failed to achieve that purpose, but we are never told in what respect this is so. [24] We are satisfied tht the escrow arrangement effect a present delivery of the additional DCA shares and that by April 6, 1970, when the 85,000 additional shares were issued to Mr. Mayer and the other former Mayer shareholders and then placed into escrow, they were not only record owners but the beneficial *236 owners of all 170,000 shares. Thus, we conclude that the parties' acquisition agreement sufficiently complied with Example (8) of the regulations and that section 483 did not apply to the agreement. Petitioner has not shown that it was ever entitled to an imputed interest deduction under the acquisition agreement, and thus it did not forbear to claim a deduction to which it was entitled. Instead it breached the acquisition agreement by improperly claiming such a deduction. Petitioner's claim that "boot" was received by the Mayer shareholders as a result of the imputed interest matter or the escrow delivery of the additional shares must be rejected. *237 With respect to petitioner's other claim of "boot," respondent contends that only DCA voting stock was received by the Mayer shareholders in the exchange and therefore the acquisition qualified under section 368(a)(1)(B). Moreover, respondent argues that under Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967), petitioner cannot challenge the tax consequences of its written acquisition agreement as construed by respondent absent a showing of fraud, undue influence, duress, or mistake in entering into the agreement. Respondent argues that petitioner has not shown the existence of any of these circumstances and is thus bound to the tax consequences of its written agreement. In Danielson, the Court of Appeals for the Third Circuit stated that -- a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction *238 or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [Commissioner v. Danielson,378 F.2d at 775.]
This Court has not adopted the Danielson rule as set forth by the Third Circuit. Coleman v. Commissioner,87 T.C. 178, 202 and n. 17 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); G C Services Corp. v. Commissioner,73 T.C. 406, 412 and n.2 (1979). The standard applied by this Court is the less stringent "strong proof" rule. Coleman v. Commissioner, supra,87 T.C. at 202. It requires the taxpayer to present "strong proof," that is, more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of the contracting parties. Elrod v. Commissioner,87 T.C. 1046, 1066 (1986); G C Services Corp. v. Commissioner, supra,73 T.C. at 412. However, the Eleventh Circuit, to which an appeal in this case would lie, has indicated its acceptance of the Danielson rule. Bradley v. United States,730 F.2d 718, 7200 (11th Cir. 1984), *239 cert. denied 469 U.S. 882 (1984); Spector v. Commissioner,641 F.2d 376, 386 (5th Cir. 1981), [25] revg. 71 T.C. 1017 (1979) cert. denied 454 U.S. 868 (1981). Thus, while we still adhere to our "strong proof" standard, we are bound to apply the Danielson rule in the instant case. Golsen v. Commissioner,54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In Danielson, the Third Circuit found that the parties in that case were bound to the terms of their agreement for the sale of a business that allocated a specific portion of the sales price to the seller's covenant not to compete. Commissioner v. Danielson, surpa,378 F.2d at 778. However, it is clear that the Danielson rule applies beyond the confines of allocating payments to a covenant not to compete. Bradley v. United States, supra, 730 F.2d at 7200 *240 (whether funds received from real property purchaser were interest income or payments on a continuing option); Spector v. Commissioner, supra,641 F.2d at 382 (whether transaction in which taxpayer surrendered his partnership interest in an accounting firm was a sale or a liquidation); Coleman v. Commissioner, surpa,87 T.C. at 202 (whether the taxpayers had a depreciable interest in certain computer equipmen involved in computer leasing arrangements). While the parties have not cited, and we have not found, a case applying Danielson in the context of a tax-free reorganization, we think the policy reasons and rationale behind Danielson make it applicable in the present case. The Third Circuit stated the following reasons for its adoption of the Danielson rule: * * * to permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. If allowed, such an *241 attack would encourage parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements. And to go behind the agreement at the behest of a party may also permit a party to an admittedly valid agreement to use the tax laws to obtain relief from an unfavorable agreement. Of vital importance, such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto. Here the buyer would be forced to defend the agreement in order to amortize the amount allocated to the covenant. If unsuccessful, the buyer would lose a tax advantage it had paid the selling-taxpayers to acquire. In the future buyers would be unwilling to pay sellers for tax savings so unlikely to materialize. Finally, this type of attack would cause the Commissioner considerable problems in the collection of taxes. The Commissioner would not be able to accept taxpayers' agreements at face value. He would be confronted with the necessity for litigation against both buyer and seller in order to collect taxes properly due. This is so because when the Commissioner tries to collect taxes from one party he *242 may, as here, dispute the economic reality of his agreement. When the Commissioner turns to the other party, there will likely be the arguments that the first party, as here, received consideration for bearing the tax burden resulting from the sale and that the covenants did indeed have economic reality. [Commissioner v. Danielson,378 F.2d at 775.]
Those concerns are particularly apt in the present case. In applying the Danielson rule to the facts of the present case, we first not that the acquisition agreement wherein petitioner acquired all of the stock of Mayer Construction stated in its preamble that: WHEREAS, the Shareholders [of Mayer companies] desire to transfer to D.C.A. and D.C.A. desires to acquire from the Shareholders all of the outstanding shares of the Corporations, solely in exchange for shares of voting common stock of D.C.A. which has no other class of stock outstanding, and for no cash or other property, upon the terms and conditions hereinafter set forth, it being intended by the parties hereto that such exchange be a tax-free reorganization within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code *243 of 1954, as amended, and that upon and after such exchange D.C.A. shall be the sole record and beneficial owner of all of the issued and outstanding capital stock of the Corporations; * * * [Emphasis supplied.]
In addition, article 13.10 of the acquisition agreement, concerning the actions of the parties to the agreement after closing, provided: Neither Shareholders, D.C.A. nor any of the Corporations shall hereafter knowingly or deliberately take, maintain or defend any course of action or position which may reasonably be construed as repudiating, conflicting with or being inconsistent with the interest of the parties as expressed herein that the exchange of stock as provided for in this Agreement shall be a tax-free reorganization within the meaning of Section 368(a)(1)(B) of the Internal Revenue Code of 1954. We think these two provisions in the acquisition agreement clearly express the intent that the acquisition qualify under section 368(a)(1)(B). On its face, the acquisition agreement is not ambiguous. As detailed in our findings of fact, petitioner and Mr. Mayer were involved in extensive arm's-length negotiations regarding the acquisition, *244 with each side represented by competent tax counsel. The acquisition agreement was redrafted twice to eliminate language that might possibly taint their intention that the acquisition qualify under section 368(a)(1)(B). Thus, under Danielson, petitioner must show that it entered into the agreement because of mistake, undue influence, fraud, duress, etc., otherwise it is bound to the tax consequences of the acquisition as stated in the agreement. The evidence in this case is overwhelming that Both DCA and Mr. Mayer intended a tax-free reorganization under section 368(a)(1)(B), just as the acquisition agreement expressly stated. On the record as a whole, we would reach the same result under our own "strong proof" standard, or under the ordinary preponderance of the evidence stated. Moreover, since "boot" could be something outside the four corners of the parties' agreement, we would have to consider the entire evidentiary record in any event. Finally, petitioner's arguments as to why the Danielson rule does not apply brings us back to the same point, an examination of all the facts and circumstances in this case. In arguing that the acquisition did not qualify as a *245 tax-free reorganization under section 368(a)(1)(B), petitioner does not contend that it entered into the agreement under any of the circumstances described in the Danielson rule. Instead, petitioner argues that in applying Danielson, we must consider the entire agreement of the parties to the acquisition. Petitioner contends that the entire agreement of the parties consists of both the acquisition agreement dated September 5, 1969, and the voting agreement entered into by Henry Mayer, Alvin Sherman, Irving Fishman, and Edward Lempka. Petitioner argues that the voting agreement guaranteed Henry Mayer a seat on DCA's board of directors. Petitioner claims this constitutes the receipt by Mr. Mayer of property other than voting stock, therefore invalidating the acquisition's treatment as a tax-free reorganization under section 368(a)(1)(B). Respondent argues that the voting agreement was a separate agreement among the respective shareholders for mutual consideration and was not part of the consideration paid by petitioner in acquiring the Mayer stock. Petitioner contends that based on the evidence in the record, the voting agreement was an integral part of the acquisition, *246 and therefore should be considered as part of the entire agreement between petitioner and Mayer Construction and the Mayer stockholders. See n.9, supra. Specifically, petitioner claims that the evidence in the record shows (1) that early in the negotiations, and as a condition of the acquisition, Henry Mayer demanded a seat on petitioner's board of directors; (2) this demand was assented to by Alvin Sherman, petitioner's president; (3) this assent was evidenced by the July 21, 1969 voting agreement between Mr. Mayer, petitioner, Alvin Sherman, Irving Fishman, and Edward Lempka; (4) that on October 24, 1969, approximately two weeks after the closing of the acquisition, a DCA board of directors meeting was held wherein Mr. Mayer was elected to DCA's board of directors; (5) that in May of 1970 the July 21, 1969 voting agreement was revised, with the revised agreement, showing petitioner as a party thereto, executed as of April 1, 1970; and (6) that Judge Schwartz's opinion in the Delaware Federal District Court action rendered March 21, 1975, found as a fact that the 1969 voting agreement was one of two ancillary agreements executed pursuant to the reorganization. Petitioner argues *247 that these facts confirm that substantially more than the acquisition agreement of September 5, 1969 was involved in the transaction between petitioner and Mayer Construction and the Mayer stockholders. Petitioner further argues that if we exclude the voting agreement in our application of Danielson, we would be ignoring vital portions of the parties' overall agreement. We disagree with petitioner's interpretation of the record and view of the facts in this case. Initially, we address the issue of when the voting agreement was executed. Henry Mayer never signed the proposed voting agreement dated July 21, 1969. Also the record does not establish that Alvin Sherman, Irving Fishman, or Edward Lempka ever signed it. The only executed voting agreement in the record is dated April 1, 1970, which was signed by Henry Mayer and the other individuals sometime in mid-May, 1970. Petitioner claims that while no executed copy of the July 21, 1969 voting agreement is in evidence, the record supports a finding that on July 21, 1969 at least a "gentlemen's agreement" existed among the respective shareholders regarding the voting agreement. We agree with petitioner that as part of the *248 acquisition Henry Mayer desired a seat on petitioner's board of directors. However, Alvin Sherman was advised by DCA's tax counsel, Morris Sherman, and Henry Mayer was advised by his tax counsel, David Beck, that receiving a seat on DCA's board of directors as part of the acquisition could constitute "boot" and jeopardize the tax-free status of the reorganization both DCA and Mr. Mayer wanted. Since Mr. Mayer and DCA each sought to have the acquisition qualify as a tax-free reorganization, any guarantee of Mr. Mayer receiving a seat on DCA's board of directors as part of the acquisition was specifically and intentionally excluded from the agreement. Instead, David Beck advised Mr. Mayer that any agreement regarding a seat on DCA's board of directors was something for Mr. Mayer to discuss with the other DCA shareholders and was not part of the planned corporate reorganization. Based on the record as a whole and for the reasons discussed below, we conclude that any unwritten "gentlemen's agreement" in 1969 or in the voting agreement executed in May of 1970 was a separate agreement among the respective shareholders and was not part of the acquisition agreement. We first note the *249 cover letter accompanying the proposed voting agreement dated July 21, 1969, a date preceding even the first draft of the acquisition agreement. The cover letter, written by Alvin Sherman to Henry Mayer, states in its first sentence "Enclosed please find a draft of a letter which will be our restrictive stock agreement between the shareholders." (Emphasis supplied.) This shows that Alvin Sherman, president of a publicly held corporation, understood the proposed voting agreement to be an agreement strictly among the respective stockholders. See n.12, supra. This proposed voting agreement, dated July 21, 1969, was never presented to petitioner's tax counsel, Morris Sherman, and was never acted upon by petitioner's board of directors. That is true also as to the voting agreement executed in 1970. We also note the proxy statements contained in the formal notices of petitioner's annual stockholders' meetings for each of the years 1970 through 1973. In describing the voting agreement dated as of April 1, 1970, each of the proxy statements states that "In April, 1970 Messrs. Sherman, Fishman, Lempka and Mayer entered into an agreement which provides * * * ." Petitioner nevertheless *250 contends that the voting agreement was not strictly among the stockholders, arguing that petitioner itself was a party to the agreement. In support of that argument, petitioner claims that without the proxies Sherman, Fishman, and Lempka held and voted on behalf of the management of DCA, the three shareholders did not collectively hold a sufficient number of shares to insure Henry Mayer a seat on the board of directors. Petitioner argues that without DCA's participation through the solicitation and vote of the proxies, the voting agreement was ineffective. Petitioner concludes therefore, that, by implication, DCA must be considered a party to the voting agreement and that therefore the agreement was not strictly among the stockholders. We do not draw the same conclusion from these facts that petitioner does.
A proxy is a grant of authority by a shareholder to someone else to vote the former's shares. Abbey Properties Co., v. Presidential Insurance Co.,119 S. 2d 74, 77 (Fla. Dist. Ct. App. 1960); 18A Am. Jur. 2d 983 (1985). A proxy holder is not the agent of the corporation *251 whose share are being voted; he is the agent of the shareholder giving the proxy. Therefore, we cannot imply that petitioner was a party to the voting agreement merely because Sherman, Fishman, and Lempka voted the proxies that they held. Moreover, on May 1, 1970, DCA had outstanding 913,443 shares of common stock, its only class of voting stock. Of these 913,443 shares, Sherman, Fishman, Lempka, and Mayer held 478,092 shares, [26] or 52.3 percent. Since DCA did not have cumulative voting, [27] the shares held by Sherman, Fishman, Lempka, and Mayer were sufficient to elect Mayer as a director in 1970 even without the proxy votes. *252 We also think the evidence in the record fully supports respondent's argument that the voting agreement was an agreement among the respective shareholders for mutual consideration. The voting agreement provides that Sherman, Fishman, and Lempka shall vote their shares so as to insure that DCA's board of directors will always contain one member nominated by Mr. Mayer. It further provides that Mr. Mayer shall vote all of his shares in favor of all other directors as Alvin Sherman shall advise him. Respondent argues that these respective promises to vote for each other constitute mutual consideration. In further support of his contention that the voting agreement contained mutual consideration, respondent points to the deposition testimony of Alvin Sherman and Irving Fishman in prior litigation with Mr. Mayer. This deposition testimony is part of the record in this case. See n.20, supra. Testifying as to why he entered into the voting agreement, Alvin Sherman stated: But there is no way that I would have gone into the [acquisition] agreement with Henry Mayer without a voting agreement between the four of us because it was agreed on and I wanted the assurance that his [Mayer's] *253 shares would not be voted against us, as he wanted the assurance that he would be put on the board, we would elect one of his choice.
We also note the deposition testimony of Fishman, describing the purpose and background of the voting agreement: Q. Do you know why the document came into existence in the first place . . .? A. Yes, to protect us against possible takeover of outside companies. We voted. We were voting each other's shares for one another. Q. Yes, and what did this accomplish? A. It guaranteed we would vote for each other, they couldn't split our votes and take over the company by an outside source. Q. And it guaranteed who would vote the shares for each other? A. Henry Mayer and the three individuals, Irving Fishman, Al Sherman, and Ed Lempka. In addition, the Delaware Federal District Court also indicated that the voting agreement was between the shareholders for mutual consideration. Mayer v. Development Corporation of America,396 F. Supp. 917, 920 (D.Del. 1975). Petitioner relies upon that court's statement that the voting agreement was one of two "ancillary agreements" [28] executed pursuant to the acquisition to *254 bolster its contention that the voting agreement should be considered as part of the entire agreement between petitioner and Mr. Mayer. However, the Delaware Federal District Court described the voting agreement as follows: In the second ancillary agreement, three DCA directors, Sherman, Fishman, and Lempka, agreed to vote their shares at all meetings held for the election of members of the DCA Board of Directors in such a way as to assure the election of at least one member nominated by Mayer. In return, Mayer agreed to vote his shares of DCA for the election of such nominees as Alvin Sherman might designate. [Emphasis supplied.] [396 F. Supp. at 920.] *255 We hold that the voting agreement was a separate agreement between the respective shareholders for mutual consideration and that DCA was not a party to the voting agreement. Therefore, we reject petitioner's contention that the voting agreement constituted property other than voting stock received from DCA by Mr. Mayer in return for his Mayer stock. Thus, whether under the Danielson rule, under our own "strong proof" rule, or under the ordinary preponderance of the evidence standard, we conclude that petitioner's acquisition of all the stock of Mayer Construction was intended to be and was a tax-free reorganization under section 368(a)(1)(B). Therefore, under section 362(b) petitioner has a carryover basis in the Mayer stock of $ 186,259, not the $ 4,775,895 cost basis it now claims. The next congeries of issues involve the liquidation of Mayer Construction in 1975 and the characterization as debt or equity of the cash advances made by petitioner to Mayer Construction from 1969 through 1975. At a special meeting of DCA's board of directors held on October 31, 1975, it was resolved that Mayer Construction be liquidated, and that prior to the end of calendar year 1975 its *256 assets, subject to existing liabilities, be distributed in complete cancellation of its outstanding capital stock. The resolution further provided that on the distribution date Mayer Construction was to transfer its assets to DCA of New Jersey, Inc., another wholly owned subsidiary of DCA. The distribution to DCA of New Jersey, Inc., was stated to be on behalf of the account of DCA. DCA had a basis in its Mayer Construction stock of $ 186,259. Mayer Construction, in the liquidation, transferred to DCA of New Jersey assets having a fair market value of $ 5,387,150. DCA says, however, that Mayer Construction was solvent at that time and that it is entitled to a deduction for worthless stock under section 165(g) or a bad debt under section 166. First, petitioner must avoid the application of section 332, which provides that no gain or loss is recognized upon the complete liquidation of a subsidiary. These interrelated issues turn on the proper characterization of DCA's advances to its subsidiary as debt or as contributions to capital. The general rule of section 332 provides that no gain *257 or loss is recognized by a parent corporation on the receipt of property distributed in complete liquidation of its at least 80-percent-owned subsidiary. [29] However, section 332 only applies if the recipient (parent) corporation receives at least partial payment for the stock which it owns in the liquidating subsidiary corporation. Section 1.332-2(b), Income Tax Regs. If section 3332 does not apply because the parent corporation does not receive any payment for its subsidiary's stock in the liquidation, then the parent corporation looks to section 165(g)[30] for a loss deductible due to the worthlessness of the subsidiary's stock. Section 1.332-2(b), Income Tax Regs.
*258 As of December 31, 1975, all of Mayer Construction's assets and liabilities had been transferred to DCA of New Jersey, Inc., in accordance with the October 31, 1975 resolution. The fair market value of the net assets received by DCA of New Jersey, Inc., was $ 5,387,150. As of December 31, 1975, the amount of advances owed by Mayer Construction to DCA was $ 16,466,831.42 and the accrued and unpaid interest calculated on that amount was $ 4,538,991. We have long recognized that amounts paid to a shareholder-creditor upon liquidation must first be applied to satisfy any outstanding indebtedness, and only the remainder of the assets distributed constitutes a distribution in liquidation in exchange for the shareholder-creditor's stock. Braddock Land Co. v. Commissioner,75 T.C. 324, 333 (1980); Houston Natural Gas Corp. v. Commissioner,9 T.C. 570, 574 (1947), affd. 173 F.2d 461 (5th Cir. 1949). See also Spaulding Bakeries, Inc. v. Commissioner,27 T.C. 684, 687 (1957), affd. 252 F.2d 693 (2d Cir. 1958); Menzies, Inc. v. Commissioner,34 B.T.A. 163, 168 (1936). *259 Thus, if we determine that the advances from petitioner to Mayer Construction constituted bona fide debt, as petitioner contends, then the net assets received would first be applied against the advances owed by Mayer Construction to petitioner. Since such advances exceed the amount of net assets received, petitioner claims it would be entitled to a partially worthless debt deduction under section 166. [31] Petitioner further argues that in that situation it would also be entitled to a worthless securities deduction under section 165(g) since section 332 would not apply to the liquidation because DCA would have received nothing in exchange for its Mayer Construction stock. *260 Respondent, on the other hand, determined that the advances from petitioner to Mayer Construction constituted capital contributions placed at the risk of Mayer Construction's business. If we determine that the advances constituted capital contributions, then the net assets received by petitioner in the liquidation would be considered as payment in exchange from Mayer Construction's stock. If so, then sections 322 would apply to the liquidation and no gain or loss would be recognized by petitioner in 1975. Respondent argues in the alternative that if we determine that the advances constituted debt, the purported liquidation of Mayer Construction followed by the transfer of all of its operating assets to DCA of New Jersey, Inc., represented in substance a reorganization under section 368(a)(1)(D), and therefore precluded the recognition of any loss by petitioner in 1975. In deciding whether the advances in question in the present case were loans or capital contributions, we first note that there is no single defined set of standards in the debt-equity area. [32] We have previously indicated *261 that each debt-equity case must be decided on its own facts and that there are so many combinations of factual circumstances that precedents in these factual cases are generally of little value. Georgia-Pacific Corp. v. Commissioner,63 T.C. 790, 796 (1975). The basic determination of the question requires an evaluation of the risk that petitioner has undertaken. The question is whether petitioner had a reasonable expectation of repayment regardless of the success of the business or whether its advances were put at the risk of the corporate venture. Gilbert v. Commissioner,248 F.2d 399, 406 (2d Cir. 1957). See also Fin Hay Realty Co. v. United States,398 F.2d 694, 697 (3d Cir. 1968); Hambuechen v. Commissioner,43 T.C. 90, 99-100 (1964). Moreover, it is petitioner who has the burden of establishing that the advances were loans. New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). *262 In resolving questions of debt versus equity, courts have identified and considered various factors. See, e.g., Stinnett's Pontiac Service, Inc. v. Commissioner,730 F.2d 634, 638 (11th Cir. 1984), affg. a Memorandum Opinion of this Court (13 factors); Estate of Mixon v. United States,464 F.2d 394, 402 (5th Cir. 1972) (13 factors) A. R. Lantz Co. v. United States,424 F.2d 1330 (9th Cir. 1970) (11 factors); Fin Hay Realty Co. v. United States, supra,398 F.2d at 696 (16 factors); Georgia-Pacific Corp. v. Commissioner, supra,63 T.C. at 796-799 (13 factors). Since an appeal in this case would lie in the United States Court of Appeals for the Eleventh Circuit, we shall look to the approach taken by that court in Stinnett's Pontiac Service, Inc. v. Commissioner, supra. See Golsen v. Commissioner, supra,54 T.C. at 756-757. The court in Stinnett's Pontiac Service identified 13 factors which merited consideration in determining whether advances constituted debt *263 or equity: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor ande stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. 730 F.2d at 638. [33] The identified factors are not all inclusive or equally significant ( Estate of Mixon v. United States, supra,464 F.2d at 402), nor is any single factor determinative. John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). Moreover, due to the myriad of factual circumstances under which debt-equity questions can arise, all of the factors are not relevant *264 to each case. Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493-494 (1980). Hereinafter, only the factors considered material to our decision will be discussed. In analyzing the relevant factors, we recognize that advances between a parent corporation and a wholly owned subsidiary are subject to particular scrutiny because the control element suggests the opportunity to contrive a fictional debt. In the Matter of Uneco, Inc.,532 F.2d 1204, 1207 (8th Cir. 1976); Cuyuna Realty Co. v. United States,382 F.2d 298, 300-301 (Ct. Cl. 1967). 1. The Name Given to the Certificate The thrust of this factor is the type of certificate used by the parties. The issuance of a stock certificate indicates an equity contribution; the issuance *265 of a bond, debenture, or note is indicative of an indebtedness. Estate of Mixon v. United States, supra,464 F.2d at 403. In the present case some of the advances were secured by notes, and twice, once as of June 30, 1972 and once as of October 3, 1974, all prior outstanding advances were consolidated into one note. The notes executed were demand notes with provisions for interest. This factor indicates that the advances here involved were loans, rather than capital contributions. 2. Presence or Absence of a Maturity Date The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same on the other hand indicates that repayment was in some way tied to the fortunes of the business, indicative of an equity advance. See Tyler v. Tomlinson,414 F.2d 844 (5th Cir. 1969). In the present case all but one of the notes in evidence are demand notes, and the one note that was not a demand note was subsequently consolidated into a demand note. Correspondence in the record reflects *266 that DCA sought repayment of the advances on several occasions. However, despite only minimal repayments, DCA still continued to advance Mayer Construction substantial additional funds. Analyzing the advances under this factor, they are more indicative of equity contributions than loans. 3. The Source of the Payments The import of this factor is that if repayment is possible only out of corporate earnings, the advance has the appearance of a contribution of equity capital. If repayment is not dependent upon earnings, the advance reflects a loan to the corporation. See Harlan v. United States,409 F.2d 904 (5th Cir. 1969). Here, the bulk of petitioner's advances were used by Mayer Construction to acquire land and to build housing developments thereon. It is clear that the only source of repayment of the advances was future sales of housing units. In a letter dated August 31, 1970 from Henry Mayer to DCA's Treasurer, Pedro Diaz, Mayer, responding to DCA's request for repayment of its advances, stated "The reduction of your loans is strictly dependent on the cash *267 flow generated from sales." Moreover, the establishment of a sinking fund or reserve was not required of Mayer Construction to insure repayment of the advances. This factor tends to show that petitioner's advances to Mayer Construction were equity and not debt. 4. Subordination Whether the advances have a status equal to or inferior to that of regular corporate creditors is of some import in the determination of whether Petitioner here was dealing as a shareholder or as a creditor. See Tomlinson v. The 1661 Corporation,377 F.2d 291 (5th Cir. 1967); United States v. Henderson,375 F.2d 36 (5th Cir. 1967); United States v. Snyder Brothers Company,367 F.2d 980 (5th Cir. 1966). In the instant case, the $ 16,316,458.97 note dated October 3, 1974, consolidating all previous parcels of real property. The mortgage stated that it was subject and subordinate to all mortgages then of record affecting the stated real property. While we do not place a great deal of emphasis on this factor (see Harlan v. United States, supra,409 F.2d at 908, and Tomlinson v. The 1661 Corporation, supra,377 F.2d at 298), it still *268 points to the advances as being equity rather than debt. 5. Intent of the Parties This is a factor that may support petitioner's position that the advances were loans. It is clear from the evidence in the record (e.g., the acquisition agreement, the notes executed, petitioner's and Mayer Construction's books and records, and their correspondence) that both petitioner and Mayer Construction always referred to the advances as loans. But while they intended the advances to be loans, they disagreed virtually from the beginning as to whether such loans were to be short-term or something more long-term in the nature of an investment in the Mayer subsidiary. Were intent the sole consideration, we might agree that the parties here intended, at least initially, to create indebtedness. However, the issue is not so much what the parties intended, but whether for tax purposes the transactions will be so recognized. Tomlinson v. The 1661 Corporation, supra,377 F.2d at 299. Thus, while this factor may indicate that the advances were loans, it is not determinative of the issue. 6. Thin or Adequate Capitalization Under this factor we look to Mayer Construction's debt-to-equity *269 ratio. The purpose if examining the debt-to-equity ratio in characterizing a stockholder advance is to determine whether a corporation is so thinly capitalized that a business loss would result in an inability to repay the advance. Such an advance would be indicative of venture capital rather than a loan. Bauer v. Commissioner,748 F.2d 1365, 1369 (9th Cir. 1984), revg. a Memorandum Opinion of this Court; Gilbert v. Commissioner, supra,248 F.2d at 407. The debt-to-equity ratio compares a corporation's total liabilities to its stockholder's equity. [34] For the calendar year ending December 31, 1969 through 1973, Mayer Construction's debt-to-equity ratios were 3.8 to 1, 4.4 to 1, 8.0 to 1, 8.7 to 1, and 73.1 to 1, respectively. [35] Unfortunately, despite numerous judicial opinions which have discussed this issue, no clear-cut set of standards or agreed-upon mathematical formula has arisen to determine whether or not a corporation is thinly capitalized for Federal income tax purposes. Rather, the courts have looked to the specific facts and circumstances *270 in each particular case in making such a determination. We agree with petitioner that the debt-to-equity ratios for the years 1969 through 1972 do not appear excessive. However, we find it significant that petitioner advanced Mayer Construction in excess of $ 6,000,000 during 1974 even though Mayer's debt-to-equity ratio was 73.1 to 1 as of December 31, 1973. This indicates that the advances were equity rather than debt since Mayer Construction's financial condition at the time made repayment of the advances extremely remote. *271 7. Source of Interest Payments A true lender is concerned with interest. Curry v. United States,396 F.2d 630, 634 (5th Cir.1968), cert. denied 393 U.S. 967 (1968). See also National Carbide Corporation v. Commissioner,336 U.S. 422, 435 n.16 (1949). The failure to insist on interest payments ordinarily indicates that the parent corporation is not seriously expecting any substantial interest income, but is interested in the future earnings of the subsidiary or the increased market value of its investment in the subsidiary. Curry v. United States, supra,396 F.2d at 634. The record in the present case shows that petitioner's advances had provisions for interest. Under the terms of the acquisition agreement, however, the interest petitioner charged Mayer Construction was the same rate that petitioner paid for its borrowed funds. Thus, DCA received no interest income from its Mayer subsidiary even though interest income and management fees from its operating subsidiaries were DCA's principal sources of income. The *272 record reflects that at least through June 1972, interest calculations on the advances to Mayer Construction were prepared on a regular basis. Although not always timely, some interest payments based on these calculations were made to petitioner. However, as of December 31, 1975, accrued and unpaid interest due petitioner on the advances was in excess of $ 4,500,000. Again, the fact that petitioner continued to advance funds to Mayer in 1973 and 1974 despite the Mayer subsidiary's failure to repay even the interest due on the advances indicates an equity contribution. 8. The Ability of the Corporation to Obtain Loans from Outside Lending Institutions If a corporation is able to borrow funds from outside sources at the time an advance is made, the transaction has the appearance of a bona fide indebtedness. Estate of Mixon v. United States, supra,464 F.2d at 410. The purpose of this inquiry is to test whether the shareholder-contributor acted in the same manner towards its wholly owned corporation as ordinary reasonable creditors would have acted. If no reasonable *273 creditor would have loaned funds to the corporation at the time of the advance, an inference arises that a reasonable shareholder would likewise not so act. Based on the evidence in the record, we do not believe that an outside lender would have loaned money to Mayer Construction as petitioner did. By the end of 1971 petitioner had advanced $ 2,090,000 to Mayer Construction and despite numerous requests for repayment of the advanced funds had received back only $ 190,500. As of the end of 1972 the total amount advanced by petitioner was $ 7,721,522, while the repayments totaled only $ 308,500. By July of 1974 petitioner had advanced Mayer a total of $ 20,748,425. Mayer Construction's repayments through that date totaled only $ 3,190,676. We think no outside lending institution would have advanced funds in this way and continued to advance funds to Mayer Construction as petitioner did in light of the subsidiary's minimal repayments and worsening financial condition. We find that this factor strongly suggests that the advances were equity and not debt. 9. The Extent to which the Advances were used to Acquire Capital Assets *274 If the advances are used to meet the daily operating needs of the corporation, this indicates a bona fide indebtedness. If the advances are used to acquire capital assets, this indicates an equity contribution. Estate of Mixon v. United States, supra at 410. In the present case the acquisition agreement stated that DCA shall make available to Mayer Construction such working capital as Mayer may require to sustain the normal growth and expansion of its business. While the acquisition agreement speaks of the advances as working capital, the record reflects that a large portion of the advances was used by Mayer Construction to purchase land for future development. By the end of 1973 Mayer Construction had acquired some 4,000 acres in southern New Jersey as part of its land banking program, a program approved by DCA. We think this factor shows that the advances were made subject to the risks of Mayer Construction's business, indicative of an equity contribution. In sum, a consideration of the relevant factors in the present case indicates that the advances were in substance capital contributions and not loans. We find petitioner' advances to its wholly owned subsidiary, *275 both in amount and in its repayment terms, far in excess of what a disinterested third-party lender would have loaned Mayer Construction based on Mayer's financial condition at the time. Thus, despite petitioner's and Mayer Construction's stated intent that the advances were to be loans, we conclude and hold that for Federal tax purposes the advances were in substance capital contributions placed at the risk of the subsidiary's business. Therefore, section 332 applies to the liquidation of Mayer Construction in 1975, and petitioner is not entitled to either a bad debt or a worthless securities deduction in that year. [36]
*276 To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Henry D. Mayer was also the petitioner in Docket No. 14486-80, which was originally consolidated with this case but which was settled before trial, possibly as a result of the litigation between petitioner and Mr. Mayer in the Federal District Court of New Jersey. See n.21, infra.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. Petitioner filed its Form 1120 for the year 1975 on September 15, 1976 pursuant to an extension of time to file. ↩
4. The record does not indicate that the parties' tax lawyers had become involved in the negotiations to that point. These proposals apparently represented the initial discussions of Mr. Mayer and Alvin Sherman, who were experienced businessmen but not lawyers. ↩
5. At that time it was not entirely clear whether section 483 applied at all to contingent stock earn-outs in various types of tax-free reorganizations, including "B" reorganizations, but the Tillinghast article assumed that it did. That assumption proved to be correct, and any doubt has now been removed by the decided cases. Vorbleski v. Commissioner,589 F.2d 123 (3d Cir. 1978), affg. 68 T.C. 413 (1977); Katkin v. Commissioner,570 F.2d 139 (6th Cir. 1978), affg. 67 T.C. 379 (1976); Solomon v. Commissioner,570 F.2d 28 (2d Cir. 1977), affg. 67 T.C. 379 (1976); Jeffers v. United States,556 F.2d 986 (Ct.Cl. 1977); Cocker v. Commissioner,68 T.C. 544↩ (1977). 6. Section 1.483-1(b)(6), Income Tax Regs,. Example (8) states: Example (8). P Corporation and Q Corporation each owns one-half of the stock of R Corporation. On December 31, 1963, pursuant to reorganization qualifying under section 368(a)(1)(B), P contracts to acquire the one-half interest held by Q for a distribution on such date of 40,000 shares of P voting stock. As a part of the plan of reorganization, Q immediately places 10,000 of such voting shares in escrow. The escrow agreement provides that all or a portion of the stock placed in escrow is to be returned to P within 3 years (together with dividends and earnings thereon) if R's net profits do not exceed certain amounts specified in the agreement and that Q Corporation is entitled to vote the escrowed stock until such time as it may be returned to P Corporation. The agreement further provides that the escrow will terminate at the end of 3 years and that any stock then remaining in escrow (together with dividends and earnings thereon) is to be redelivered to Q Corporation. Q Corporation currently includes in income all dividends and earnings thereon with respect to the escrowed stock. Since Q Corporation is treated as having received, on December 31, 1963, all payments due under the exchange, section 483↩ does not apply to the transfer of any of the excrowed stock to Q Corporation. 7. Mr. Beck and Mr. Sherman were no doubt correct. Mr. Sherman's provision for delivery of the additional shares after December 31, 1972 would seem to come within Example 7 of section 1.483(b)(6), Income Tax Regs., which was also discussed in the Tillinghast article and which resulted in imputed interest under section 483↩. 8. Mr. Mayer, as well as other individuals involved in these negotiations, and even lawyers at that time, confused the matter of a tax-free exchange under section 368(a)(1)(B) and the separate problem of imputed interest on any later "payments" of stock in such a tax-free exchange. See n.5, supra.↩ However, there is no doubt that Mr. Mayer was insistent that there by no tax liability of either type. 9. The acquisition agreement was between DCA, as one party, and the Mayer companies and Mayer stockholders, as the other party. The principal DCA stockholders (Alvin Sherman, Irving Fishman, and Edward Lempka), in their capacity as stockholders, were not parties to the acquisition agreement. ↩
10. The computation of the initial shares (8 x consolidated net earnings divided by $ 15.00 per share of DCA stock) actually yielded 87,021 shares of DCA stock. The computation of the additional shares (6 x excess earnings divided by $ 15.00 per share of DCA stock) actually yielded 182,543 shares of DCA stock, but of course the former Mayer shareholders were limited, under the terms of the acquisition agreement, to no more than 85,000 initial shares of DCA stock and no more than 85,000 additional shares. ↩
11. For example, in its Proxy Statement for the annual stockholders' meeting to be held June 17, 1970, DCA reported that Alvin Sherman owned 192,431 shares (approximately 21 percent) and Henry Mayer owned 118,068 shares (approximately 13 percent) of DCA's stock. ↩
12. Alvin Sherman testified that he and Mr. Mayer "played lawyer" and entered into a "side agreement," this proposed voting agreement. Petitioner now argues that the proposed voting agreement was either executed or at least constituted a binding "gentlemen's agreement," that this agreement constituted "boot" received by Mr. Mayer from DCA and thus the 1969 transaction was not a tax-free "B" reorganization. The Court simply does not believe Mr. Sherman's testimony. The Court finds it inherently incredible that these two non-lawyers, having retained competent tax counsel to structure the transaction to qualify as a tax-free "B" reorganization, having been warned about "boot," having been told a provision for a board seat could constitute "boot," having been told that any "boot" would invalidate the tax-free transaction sought by both DCA and Mr. Mayer, nonetheless "played lawyer" and entered into such a "side agreement." If this highly implausible scenario occurred at all, which we doubt, Alvin Sherman could only have been acting in his individual capacity as a shareholder and not in his capacity as a corporate officer. It would be a breach of fiduciary duty for a corporate officer to ignore the legal advice of the corporation's tax counsel, to enter into such an agreement knowing the corporation's tax counsel had been instructed to structure a tax-free "B" reorganization and knowing from that tax counsel that any "boot" would jeopardize the very tax-free transaction sought. Alvin Sherman was the president of a publicly held corporation and owned 26.1 percent of the DCA stock. It is inherently incredible that he would purport to bind the corporation in such a side agreement that would amount to a breach of the acquisition agreement and do so without consulting the corporation's tax counsel and without presenting the matter to the DCA board of directors. There is no evidence that the proposed voting agreement or any other voting agreement was ever submitted to or acted upon by the DCA board. ↩
13. There was some initial confusion in the record as to whether Mr. Mayer sent the proposed voting agreement dated July 21, 1969 or a proposed revised version dated April 1, 1970 to Mr. Beck for review. Based upon the record as a whole, the Court concludes that he inadvertently sent the 1969 version thinking that it was the same as the 1970 version that Diaz later sent to him after their conversation about the proxy statement. ↩
14. In contrast to the proposed voting agreement dated July 21, 1969 the signature of the April 1, 1970 proposed revised voting agreement included Development Corporation of America as follows: Very truly yours, DEVELOPMENT CORPORATION OF AMERICA
Alvin Sherman Irving Fishman Edward Lempka Read and Accepted:
Development Corporation of America had not been listed in the signature line of the July 21, 1969 proposed voting agreement. ↩
15. As early as September 4, 1970, the money arguments were becoming more heated, with Mr. Mayer writing to Alvin Sherman as follows: I can summarize my sentiments in a nut shell: "Without money who needs you, the constant pressure, the aggravation, the management fees, the whole bit." The whole purpose of the merger was to provide us with adequate funds and relieve pressure, not to create it. ↩
16. At some point the Mayer Construction subsidiary's name was changed to the "Mayer Corporation" and the Mayer Corporation had subsidiaries of its own. However, for convenience and consistency, we will usually refer to the corporation as either the Mayer subsidiary or Mayer Construction.↩
17. That report is referred to in the minutes of the executive committee meeting held on January 16, 1974, at which it was first decided that Mr. Mayer's resignation would be requested. The report was prepared later because it refers to events occurring in February 1974. ↩
18. The Court declines to find that any losses were caused by or attributable to any negligence or mismanagement on the part of Mr. Mayer. Such charges have been made in numerous other lawsuits and have never been established. Based on the record as a whole, the Court is satisfied that the market for housing in southern New Jersey simply vanished as a result of the energy crisis and that fact, plus the environmental concerns restricting development of Mayer Construction's land, account for the business difficulties encountered by the subsidiary at that time. Had the expansion in southern New Jersey developed as DCA and Mr. Mayer reasonably expected it to, the Mayer Construction land banking program, a program approved by DCA's board of directors, could have produced a bonanza, with Mayer Construction as the very successful giant Mr. Palmisciano thought he was going to work for. The specific charges by Alvin Sherman are not relevant to the issues this Court must decide, but the resulting litigation is relevant or at least provides the excuse for some of the issues raised here. See, for example, nn.19, 21, 28, infra.↩
19. The motions were denied on March 21, 1975 in a comprehensive opinion by the Honorable Murray Schwartz, United States District Judge in Delaware. In the present Tax Court case, the parties have stipulated to the pleadings and motions in the various lawsuits in the Florida and Delaware federal district courts, but they have not stipulated to the correctness of the various allegations by the litigants in those lawsuits. In the present Tax Court case, DCA relies upon statements made in Judge Schwartz's opinion, statements describing the proposed voting agreement of July 21, 1969 as an "ancillary agreement" executed pursuant to the acquisition agreement and a footnote suggesting that the July 21, 1969 proposed voting agreement was actually signed by the parties thereto. This Court is not aware of the evidentiary record before Judge Schwartz. However, in ruling on these various preliminary motions, his opinion points out numerous lacunae in the factual record and various factual areas that should be developed when and if the cases proceeded to trial. The cases did not go to trial. For these reasons, we do not regard Judge Schwartz's comments about the proposed voting agreement of July 21, 1969 as findings of fact. We have made our own finding of fact based on the fully developed evidentiary record presented at the trial before this Court. See also n.28, infra.↩
20. In the present Tax Court case, the parties have stipulated into evidence for all purposes eight depositions and four volumes of transcript of the four-day trial before Judge Meanor. The parties have also stipulated to Judge Meanor↩'s comprehensive 72-page opinion on the merits as well as his earlier opinion on the defendants' earlier motions for summary judgment, which had been denied. While we have carefully considered all of these materials, we have also considered the testimony in this Court and our opportunity to observe the witnesses before us. 21. It was apparently because of this judicial determination that petitioner in this Tax Court proceeding no longer contest respondent's disallowance of the imputed interest deduction claimed by DCA on its 1973 return, and the Internal Revenue Service has settled its case with Mr. Mayer. See n.1, surpa. We note that Judge Meanor clearly and carefully limited his opinion to the breach of contract issues before him and expressed no opinion on the tax issues now before this Court. Mayer v. Development Corp. of American,541 F. Supp. 828 (D. N.J. 1981), affd. without published opinion 688 F.2d 822 (3d Cir. 1982). Petitioner has chosen not to pursue the imputed interest issue, as such, in this Court, taking the position that Judge Meanor's opinion "effectively precluded" it from doing so. We assume petitioner does not mean "legally precluded" it but that the practical results of having to pay damages to Mr. Mayer, including any taxes on any imputed interest income to him, precluded petitioner for business reasons. Thus, because of petitioner's concession, it might appear that this Court would not be called upon to resolve the imputed interest issue. However, while not pursuing the issue for the year 1973, petitioner, in its arguments for the year 1975, argues that it was entitled to an imputed interest deduction and having agreed to forgo the same that constitutes boot so as to destroy the tax-free nature of the 1969 acquisition agreement. To the extent that this further "boot" argument is bottomed upon Judge Meanor↩'s opinion and holding, it seems to be an argument that DCA's own breach of contract constituted "boot". 22. Section 368(a)(1)(B) provides:
SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization. -- (1) In General. -- For purposes of parts I and II and this part, the term "reorganization" means-- * * * (B) the acquisition by one corporation, in exchange solely for all or a part of its voting stock (or in exchange solely for all or a part of the voting stock of a corporation which is in control of the acquiring corporation), of stock of another corporation if, immediately after the acquisition, the acquiring corporation has control of such other corporation (whether or not such acquiring corporation had control immediately before the acquisition); ↩
23. Section 1012 provides:
SEC. 1012. BASIS OF PROPERTY -- COST. The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distribution and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.
Generally, the cost of property is the amount paid for such property in cash or other property. Sec. 1.1012-1(a), Income Tax Regs. The parties in this case disagree on what petitioner's cost basis in the Mayer shares would be under section 1012. On its 1975 tax return petitioner claimed a cost basis of $ 4,775,895, composed of $ 1,020,000 for the initial 85,000 shares (85,000 x $ 12 fair market value on closing date) and $ 3,755,895 for the additional shares. The parties' disagreement relates to the value of the 85,000 additional shares received by the Mayer shareholders. Petitioner computes its cost basis for the additional shares on 192,610 shares (the 85,000 additional shares plus those from stock splits and dividends) at $ 19.50 per share, the fair market value in April 1973, when those shares were release from escrow. The 85,000 additional shares were issued to the Mayer shareholders in April 1970, then placed in escrow for approximately three years during the "earn-out" period. Petitioner argues that the Mayer shareholders were not the beneficial owners of the additional shares until the shares were released from escrow in April 1973. Therefore, petitioner contends that for purposes of section 1012, the additional shares should be valued as of April 1973. Respondent computes the cost basis for the additional shares of 85,000 shares x $ 12.25, the fair market value on April 6, 1970, when the additional 85,000 shares were issued and placed in escrow, for a total cost basis of $ 2,061,250 rather than the $ 4,775,895 claimed by petitioner. Respondent argues that all the incidents of ownership of the additional shares were obtained by the Mayer shareholders upon issuance to them in April 1970. We agree and have so found. Thus, we agree with respondent that if we find that petitioner's basis in the Mayer shares is to be determined under section 1012, then the additional DCA shares should be valued as of April 1970. However, the correct cost basis figure is not relevant to our disposition of the case since we find, for the reasons stated below, that petitioner's acquisition of Mayer Construction qualified as a tax-free reorganization under section 368(a)(1)(B). Therefore, petitioner takes a carryover basis in the Mayer shares of $ 186,259 under section 362(b)↩. 24. Morris Sherman testified and petitioner argues on brief that the parties' escrow arrangement did not satisfy the requirements of Example (8) of section 1.483-1(b)(6), Income Tax Regs.↩, but we are never told in what specific respects. Morris Sherman suggested the escrow arrangement differed from Example (8) because of DCA's alleged business concerns. DAC's only business concern was the total number of DCA shares to be issued to acquire the Mayer companies. The outside limit was already essentially foreordained by the Mayer companies' high earnings that supported the 80,000 to 85,000 initial shares, with the additional shares not to exceed that number. Thus, while Alvin Sherman fretted over "paying" 160,000 to 170,000 DCA shares, which he thought amounted to about $ 2,000,000, more than he thought the companies were worth, nonetheless he agreed to do so. While Morris Sherman testified and petitioner now argues on brief that the escrow provision somehow related to DCA's business concerns about the number of shares to be issued, that argument is not borne out by the record as a whole. 25. In Bonner v. City of Prichard, Ala.,661 F.2d 1206, 1209↩ (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. 26. This figure includes 26,022 shares owned by Henry Mayer's wife, Marianne, and 19,684 shares owned by the Mayers' minor children. ↩
27. Cumulative voting is a method of voting for corporate directors entitling each shareholder to cast a number of votes equal to the number of his shares multiplied by the number of directors, or the number of directors to be elected, with the option of giving all his votes to a single candidate or of distributing them among two or more as he sees fit. The purpose of cumulative voting is to enable the minority stockholders of a corporation to secure representation on the board of directors. However, where there is no cumulative voting, as is the case with DCA, the owners of more than 50 percent of the voting stock may elect all the directors. See 18B Am. Jur. 2d 286-292 (1985). ↩
28. Mayer v. Development Corporation of America,396 F. Supp. 917, 920 (D.Del. 1975). The other agreement the Delaware Federal District Court was referring to was the employment agreement between Henry Mayer and the newly formed Mayer Construction, the wholly owned subsidiary of DCA. Interestingly, in the later litigation in the New Jersey Federal District Court, DCA argued that Mr. Mayer's disclosure in the Delaware litigation of the unexecuted July 1969 Letter Voting Agreement and Judge Schwartz's statement about "ancillary agreements" constituted a breach by Mr. Mayer of section 13.10 of the acquisition agreement, quoted in the text above, so as to relieve DCA of its breach of section 13.10. Judge Meanor rejected that argument, stating, among other things: Judge Schwartz' reference to the July 1969 Letter Voting Agreement as "ancillary" to the reorganization was not a determination of an issue presented to him by the plaintiffs [the Mayers]. It was merely a prefatory "factual" statement and certainly not the ratio decidendi on any legal argument or position taken by the plaintiffs. Furthermore, the crucial connection between Judge Schwartz's characterization of the July 1969 Letter Voting Agreement as an "ancillary" agreement and a determination by the I.R.S. that this agreement constitutes the talismanic "boot" is too attenuated for me to draw. * * * [Mayer v. Development Corp. of America, supra,541 F. Supp. at 860.]
We agree with Judge Meanor. See also n.19, supra.↩
29. Section 332, in pertinent part, provides as follows:
SEC. 332. COMPLETE LIQUIDATIONS OF SUBSIDIARIES. (a) General Rule. -- No gain or loss shall be recognized on the receipt by a corporation of property distributed in complete liquidation of another corporation. (b) Liquidations to Which Section Applies. -- For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if -- (1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends); and either (2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the taxable of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancellation or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; or (3) such distribution is one of a series of distributions by such other corporation in complete cancellation or redemption of all its stock in accordance with a plan of liquidation under which the transfer of all the property under the liquidation is to be completed within 3 years from the close of the taxable year during which is made the first of the series of distributions under the plan, except that if such transfer is not completed within such period, or if the taxpayer does not continue qualified under paragraph (1) until the completion of such transfer, no distribution under the plan shall be considered a distribution in complete liquidation. ↩
30. Section 165(g) provides as follows: (g) Worthless Securities. -- (1) General rule. -- If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security defined. -- For purposes of this subsection, the term "security" means -- (A) a share of stock in a corporation; (B) a right to subscribe for, or to receive, a share of stock in a corporation; or (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form. (3) Securities in affiliated corporation. -- For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if -- (A) stock possessing at least 80 percent of the voting power of all classes of its stock and at least 80 percent of each class of its nonvoting stock is owned directly by the taxpayer, and (B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operating business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, and gains from sales or exchanges of stocks and securities.
In computing gross receipts for purposes of the preceding sentence, gross receipts from sales or exchanges of stocks and securities shall be taken into account only to the extent of gains therefrom. As used in subparagraph (A), the term "stock" does not include nonvoting stock which is limited and preferred as to dividends. ↩
31. Section 166, in pertinent part, provides as follows: SEC. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction. -- For purposes of subsection (1), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.
Section 1.166-1(c), Income Tax Regs., provides that only a bona fide debt qualifies for purposes of section 166 and defines a bona fide debt as follows: A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * A gift or contribution to capital shall not be considered a debt for purposes of section 166↩. * * * 32. In the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 613, sec. 415(a), Congress enacted section 385 as an attempt to pass to respondent the task of prescribing appropriate regulations to determine whether an interest in a corporation is to be treated as debt or equity. Section 385 provides as follows: SEC. 385. TREATMENT OF CERTAIN INTERESTS IN CORPORATIONS AS STOCK OR INDEBTEDNESS. (a) Authority To Prescribe Regulations. -- The Secretary or his delegate is authorized to prescribe such regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness. (b) Factors. -- The regulations prescribed under this section shall set forth factors which are to be taken into account in determining with respect to a particular factual situation whether a debtor-creditor relationship exists or a corporation-shareholder relationship exists. The factors so set forth in the regulations may include among other factors: (1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest, (2) whether there is subordination to or preference over any indebtedness of the corporation, (3) the ratio of debt to equity of the corporation, (4) whether there is convertibility into the stock of the corporation, and (5) the relationship between holdings of stock in the corporation and holdings of the interest in question.
Final regulations for section 385 were issued in December of 1980, T.D. 7747, 1981-1 C.B. 141, but with a delayed effective date that subsequently was extended several times. Effective August 5, 1983, however, the section 385 regulations were withdrawn, T.D. 7920, 1983-2 C.B. 69, thus leaving only case law to guide our inquiry into the debt-equity issue. Moreover, even if the regulations had not been withdrawn, they could only be advisory to us in the present case since the regulations applied only to interests in corporations created after December 31, 1980, 1981-1 C.B. 141↩, and all the transactions in the present case took place from 1969 to 1975. 33. We note that the Eleventh Circuit adopted the 13 factors and the analysis used by the Fifth Circuit in Estate of Mixon v. United States, supra,464 F.2d at 402-411. See n.25, supra.↩
34. Congress recognized this as the appropriate method of calculating the debt-to-equity ratio in enacting section 385: The debt-equity ratio of the issuing corporation for purposes of this test generally is determined by comparing the corporation's total indebtedness with the excess of its money and other assets over that indebtedness. * * *
S. Rept. 91-552 (1969), 1969-3 C.B. 423↩, 513. 35. These ratios are calculated as follows: Year
Total
Stockholder's
Ended
Liabilities
Equity
Ratio
12/31/69
$  1,822,221
$    478,192 3.8 to 1
12/31/70
3,052,009
699,497 4.4 to 1
12/31/71
8,926,643
1,111,551 8.0 to 1
12/31/72
20,257,701
2,320,181 8.7 to 1
12/31/73
26,845,057
367,129 73.1 to 1
12/31/74
29,753,840
(11,703,282) * * Ratio cannot be calculated due to negative stockholder's equity. ↩
36. Since we hold for respondent on this issue, we need not address his alternative argument that the liquidation of Mayer Construction and transfer of its assets to DCA of New Jersey, Inc., constituted a reorganization under section 368(a)(1)(D)↩. However, based on the facts in this case as detailed n our Findings of Fact above, we think respondent's argument is well taken. DCA of New Jersey carried on rather than winding down the business, until a new energy crisis in 1979 precipitated a decision to get out of the building business. Any loss that occurred would not be recognized before 1979, if at all. In 1979 petitioner went out of the building business in New Jersey and contributed the stock of DCA of New Jersey [under a new name of CentrOcean] to the University of Miami. Based on the fair market value of that stock, petitioner claimed a charitable deduction of $ 920,193 in 1979 and $ 907,379 in 1980.